WILLIAM R. CRAIG and Others, Appellants, Respondents, *v.* JAMES T. ANYON and Others, Respondents, Appellants, Impleaded with RUPERT S. HUGHES and Others, Defendants.

First Department, February 20, 1925.

Negligence — action to recover damages alleged to have been caused by accountants' failure to discover falsification of books of stock brokerage firm by employee thereof — books were audited at three-month intervals — employee who falsified books and caused loss had general authority from plaintiffs — plaintiffs failed to check employee's work — loss not direct result of negligence by defendants.

The defendants, a firm of accountants, were not liable to the plaintiffs, a stock brokerage firm, for loss caused the firm by the falsification of its books by one of its employees, for the plaintiffs were themselves guilty of negligence in failing to investigate the activities of their employee who had general charge of

the branch office, since the evidence shows that the defendants were employed under a contract to audit the books of the firm at three-month intervals; that they were under the direction of the employee who furnished them with the books at such times as he desired and was thereby able to cover up a false account; that the falsification occurred in a customer's account in reference to which the employee had authority, with the knowledge of the plaintiffs, to buy and sell for said customer, so that in all transactions he represented both the customer and the plaintiffs; that the account was a very large one and large sums of money were paid out from time to time without any investigation on the part of the plaintiffs concerning the condition of the account; that the employee who was in charge of plaintiffs' commodities department had absolute control of that department and was given a free hand by the plaintiffs, without any supervision, to deal with the account in question and to direct all bookkeeping entries in relation thereto.

Under the circumstances, the loss arising out of the account in question was not caused solely by the negligence of the defendants in failing to discover the falsification of the books, but was due also to the negligence of the plaintiffs in failing to make proper inquiries as to this account and to check up the activities of the employee.

CLARKE, P. J., dissents, with memorandum.

APPEAL by the plaintiffs, William R. Craig and others, from a judgment of the Supreme Court in favor of the plaintiffs and against the appellants, entered in the office of the clerk of the county of New York on the 26th day of May, 1922, upon the verdict of a jury, and also from an order entered in said clerk's office on the 12th day of July, 1922, setting aside the answer of the jury as to the amount of damages and limiting the plaintiffs' recovery. The plaintiffs appeal from the judgment in so far as it limits their recovery of damages to $2,000 and fails to award them damages in the sum of $1,177,805.26.

Appeal by the defendants, James T. Anyon and others, from said judgment and also from said order in so far as it denies defendants' motion to set aside that part of the verdict finding that the appellants were negligent in the performance of an agreement.

The complaint was dismissed at the end of plaintiffs' case as to the defendants Hughes, Glover, Bentley, Thompson, MacKinnion and Allen. The plaintiffs have not appealed from the judgment in this respect.

*Moore, Hall, Swan & Cunningham* [*John H. Jackson* of counsel; *Warren W. Cunningham* with him on the brief], for the plaintiffs.

*Cook, Nathan & Lehman* [*Alfred A. Cook* of counsel; *Harold Nathan, Frederick F. Greenman* and *Nathan R. Margold* with him on the brief], for the defendants Anyon and others.

MARTIN, J.:

The plaintiffs during the years 1913 to 1917, inclusive, were engaged in business in New York city as brokers in stocks and commodities

such as cotton, wheat and coffee. Their transactions on behalf of customers were conducted on the New York Stock Exchange, the Cotton Exchanges in New York and New Orleans, the Chicago Board of Trade and similar exchanges in which they had membership. The business was apparently prosperous and the partners had enjoyed a large income therefrom. On May 26, 1917, through the confession of Robert Moore, an employee of their commodities department, following an office investigation, they learned that their prosperity had been an illusion, and that their books had been falsified by Moore throughout a period of nearly five years, during which they had been defrauded of over $1,250,000.

During the entire five years' period, the defendants, composing an accounting firm well known both in the United States and England, were under retainer from the plaintiffs. Each three months throughout this period the books were audited by them and a report submitted, by which reports the plaintiffs say they were assured the books were properly kept, no reference being made to any irregularity.

The action is founded upon the charge that these audits were negligently made; that, had any audit been made with reasonable care, the falsification of the books would have been discovered, Moore would have been discharged and no further loss would have occurred.

The complaint alleges a contract whereby the defendants undertook periodically to audit the plaintiffs' books and accounts and to report any errors or omissions therein, and negligence by the defendants in the performance of the contract and damage to the plaintiffs amounting to the sum of $1,280,233.61. This is made up of sums paid to customers to whom, it is alleged, nothing would have been paid except for the defendants' negligent failure to report that similar unauthorized payments had previously been made, and of other sums paid to brokers, and not charged to any customer, upon transactions which, as it is alleged, would not have been permitted were it not for the defendants' negligence in failing to report irregularities consisting of similar transactions previously made.

The answer admits the employment of the defendants to audit the plaintiffs' books " subject to certain instructions and limitations" imposed " by the plaintiffs and their predecessor firms; denies the allegation of negligent performance of the contract; and sets up as a defense negligence on the part of the plaintiffs and both negligence and " larceny, embezzlement and criminal acts and practices " on the part of employees of the plaintiffs.

The action was tried in May, 1922. At the end of plaintiffs'

case a motion to dismiss was denied except as to six defendants who had become members of the firm after 1917.

The defense rested without offering evidence and the motion to dismiss was renewed. The court reserved decision in accordance with the practice set forth in section 1187 of the Code of Civil Procedure (Civ. Prac. Act, §§ 459, 585), and submitted two specific questions to the jury, as follows:

" Were the defendants negligent in the performance of their agreement with Craig & Co.? "

" If so, what damages to the plaintiffs resulted directly and proximately from such negligence? "

The court charged that if the defendants were found liable the verdict must be either for $2,000, the amount paid as compensation for the defendants' services; or for $1,177,805.26, the amount of plaintiffs' actual loss as proved. To the first question the jury answered, " Yes; " to the second question, " $1,177,805.26."

Upon the rendition of the verdict the defendants' motion to set aside the answer to the second question was granted; the defendants' motion to set aside the answer to the first question was denied; and a general verdict was directed in favor of the plaintiffs for $2,000, appropriate exceptions being noted by the plaintiffs. The order recites that the court proceeded " on the ground that as a matter of law the only loss which resulted directly and proximately from the negligence of the defendants was the sum of $2,000."

The three main questions litigated were (1) the degree of care actually used by the defendants; (2) the understanding or agreement of the parties with respect to the scope of the audits to be made; (3) the degree of care used by the plaintiffs. The three questions are closely interlocked and are to be answered by the inferences to be drawn from practically undisputed evidence.

It is apparent from an examination of the record that the jury found the defendants were negligent and the court agreed with the jury on that question, but disagreed with it as to the damages resulting from such negligence.

Three questions are before us on this appeal: (1) Were the defendants negligent; (2) did the plaintiffs' negligence contribute to the loss, and (3) assuming defendants were negligent, what damages resulted therefrom? The first question has been resolved in favor of the plaintiffs both by the jury and the court. With reference to that question, therefore, it is necessary only to inquire whether the evidence warranted a finding of negligence.

The plaintiffs contend that defendants are chargeable with negligence by reason of the carelessly conducted audit of the plaintiffs' books. It is asserted that one or more books were in the

custody of the plaintiffs when each audit was made, an examination of which would have disclosed the account of one Zabriskie as reflecting an indebtedness to the plaintiffs of many thousands of dollars.

The defendants offered no evidence and no defense, except the cross-examination which developed the fact that an inspection of all the books in the office would have disclosed irregularities; whereas the auditors, in making investigations and reports, relied on books, papers and carbon copies of statements to customers furnished by one Moore, who apparently had charge of a division of the business.

There can be very little doubt as to carelessness by the auditors. Whether it caused the loss is a more difficult question. Although a proper audit would have disclosed facts leading to the discovery of Moore's wrongdoing, there are a number of other elements entering into this case which show that the plaintiffs are not without blame and might have avoided the loss.

They now seek to make Moore a mere clerk. He was much more. He was in charge of plaintiffs' commodities department. He was permitted to absolutely control that department; and the real cause of the loss is to be found in the fact that he was given a free hand, without any supervision, to deal with the accounts of Zabriskie and others at will. He decided what entries were to be made by the bookkeepers and how they were to be made, so far as transactions in his division of the business were concerned. He was permitted to give directions for the firm to outside brokers as to whether transactions should be closed or carried as " open."

This appears to have been of great assistance in enabling him to keep the actual condition of the Zabriskie account concealed. To this customer large sums of money were paid from time to time, the payment of which was unwarranted, for the accounts with him would have shown the absence of a sufficient balance to meet margins. Money was paid to him at a time when he must have been heavily indebted to plaintiffs.

Should the plaintiffs have relied on Moore who was dealing with the Zabriskie account for Zabriskie and at the same time taking care of the account for the plaintiffs? Certainly they were called upon to exercise some supervision in the matter. Having left a branch of their business to an employee, it does not seem reasonable that although there was no supervision they should now be permitted to charge the loss to the auditors who, apparently on account of the dishonesty of such employee, failed to uncover defalcations.

In his charge to the jury the court said: " These defendants

First Department, February, 1925.                    [Vol. 212

rendered such reports every three months. These reports undoubtedly contained mistakes and inaccuracies. They were based on what Moore wanted them to believe was the position of the firm and not on the true position of the firm."

The auditors relied on Moore. They were deceived by him. So were the plaintiffs. The auditors could have performed their work independently of what they were told by Moore. But Moore was the employee who dealt with them and who gave them the books and papers upon which they were to work. They did not suspect any wrongdoing and believed they were justified in taking the information given them by the firm's representative, who exercised without interference, power to deal with them in reference to their work in the commodities department. Defendants relied on Moore's honesty, but no more than did plaintiffs.

In *Matter of Kingston Cotton Mill Company (No. 2)* (L. R. [1896] 2 Ch. Div. 279) Lord Justice LINDLEY said: " In this case the auditors relied on the manager. He was a man of high character and of unquestioned competence. He was trusted by everyone who knew him. The learned judge has held that the directors are not to be blamed for trusting him. The auditors had no suspicion that he was not to be trusted to give accurate information as to the stock-in-trade in hand, and they trusted him accordingly in that matter. But it is said they ought not to have done so, and for this reason. The stock journal shewed the quantities — that is, the weight in pounds — of the cotton and yarn at the end of each year. Other books shewed the quantities of cotton bought during the year and the quantities of yarn sold during the year. If these books had been compared by the auditors they would have found that the quantity of cotton and yarn in hand at the end of the year ought to be much less than the quantity shewn in the stock journal, and so much less that the value of the cotton and yarn entered in the stock journal could not be right, or at all events was so abnormally large as to excite suspicion and demand further inquiry. This is the view taken by the learned judge. But, although it is no doubt true that such a process might have been gone through, and that, if gone through, the fraud would have been discovered, can it be truly said that the auditors were wanting in reasonable care in not thinking it necessary to test the managing director's return? I cannot bring myself to think they were, nor do I think that any jury of business men would take a different view. It is not sufficient to say that the frauds must have been detected if the entries in the books had been put together in a way which never occurred to any one before suspicion was aroused. The question is whether, no suspicion of anything wrong being

App. Div. 55]          First Department, February, 1925.

entertained, there was a want of reasonable care on the part of the auditors in relying on the returns made by a competent and trusted expert relating to matters on which information from such a person was essential. I cannot think there was. The manager had no apparent conflict between his interest and his duty. His position was not similar to that of a cashier who has to account for the cash which he receives, and whose own account of his receipts and payments could not reasonably be taken by an auditor without further inquiry. The auditor's duty is not so onerous as the learned judge has held it to be.''

Lord Justice LOPES said (at p. 290): '' The duties of auditors must not be rendered too onerous. Their work is responsible and laborious, and the remuneration moderate. I should be sorry to see the liability of auditors extended any further than in *In re London and General Bank* (L. R. [1895] 2 Ch. 673). Indeed, I only assented to that decision on account of the inconsistency of the statement made to the directors with the balance-sheet certified by the auditors and presented to the shareholders. This satisfied my mind that the auditors deliberately concealed that from the shareholders which they had communicated to the directors. It would be difficult to say this was not a breach of duty. Auditors must not be made liable for not tracking out ingenious and carefully laid schemes of fraud when there is nothing to arouse their suspicion, and when those frauds are perpetrated by tried servants of the company and are undetected for years by the directors. So to hold would make the position of an auditor intolerable.''

Lord Justice KAY said (at p. 293): '' It is said that it is easy to be wise after the event. In former years when the stock journal was correctly entered the alterations in value in a year were frequently very considerable. The increase in the years now in question did not excite any suspicion in the directors. Why should it in the auditors? They had no reason to distrust the manager. Moreover, he had, or was supposed to have, taken the stock which was actually on the premises at the date to which the balance-sheets referred. The auditors could not do this. The only book from which they could obtain information as to the quantities received in the year other than the stock journal was a book called the ' invoice guard book,' in which were pasted the invoices received with goods supplied. But this was not necessarily accurate. Invoices received might have been omitted. Goods might in some cases have been received without invoices. Were the auditors bound to enter upon an investigation which could not bring out an accurate result in order to test the truth of a statement by the manager which no one had any reason to discredit? ''

The court instructed the jury that these auditors did not guarantee the correctness of their accounts. " They do not say to the public, ' Let us examine your books and vouchers and we will with absolute certainty discover every dishonesty, every mistake that exists in those books, and we will protect you against that.' " That is not what they undertook to do. They agreed to use such skill in the performance of their agreement as reasonably prudent, skillful accountants would use under the circumstances.

One of the plaintiffs, Mr. Craig, said that when defendants originally began their duties for a predecessor firm they agreed to supervise, superintend and send out certain statements to customers. Mr. Craig knew that was never done. Plaintiffs refused to allow statements to be sent to customers. It is further asserted that the defendants agreed to take the open contracts and to calculate the actual liability of the customers thereon at the time of each audit. It was known that defendants never made such calculations.

The plaintiff Craig says that they told him, " We have to make that calculation both for straddles and open accounts before we can tell you what is the actual standing of this firm." Craig's statements with reference to the contract were made to a man who has since died, leaving no way of directly meeting his testimony in this respect. Craig was aware that there had been for several years a failure to strictly live up to arrangements and agreements as to what was to be accomplished.

Zabriskie started his account in 1909, writing the brokers a letter that he was sending them $200 for margin, and that Moore, the plaintiffs' employee, should have the right to give directions to buy and sell for his account. In other words, it became what is known as a discretionary account. He directed that as soon as the $200 margin was exhausted, the account should be closed. Moore thereafter gave orders to buy and sell for Zabriskie's account. The relationship between Moore and Zabriskie does not appear, but it does appear that the loss could not have occurred if Zabriskie's account had been closed out when his margin had become exhausted.

When Moore gave an order to a broker in Chicago to sell wheat, he would sometimes charge that order to the account of Zabriskie but at other times he would not. He always entered the transactions or had them entered in the blotter. He told the clerks what entries they were to make in the charge ledger. At times he gave an order to enter such contracts against Zabriskie in this ledger and at other times he did not. If these books were all examined at the end of the three months, any accountant, skilled or unskilled, would have discovered something was wrong, or that some entry remained to be made. Items not entered in the proper

place were entered in the back of the book on pages beyond the charge account in the customers' open contract ledger. They were made against Zabriskie but with instructions that they were not to be entered as actual charges against him. This was feasible because Moore was allowed to deal to the extent of very great sums in Zabriskie's account for Zabriskie and at the same time had charge of the branch office to the extent of deciding what bookkeeping entries should be made. Though Moore was directing these very extensive dealings from both sides, nothing was ever done to check up and see whether the transactions were in order. Moore arranged for payments to Zabriskie from time to time. These payments should never have been made; for with the true condition of his account known it would have been apparent that margins on hand did not warrant them. Had the " opens " been properly checked it could have been seen whether Zabriskie had balances due him and whether they warranted the payments made to him. Craig made large payments to him without attempting to ascertain how his accounts stood. Moore had the sole control in a department of plaintiffs' activities and therein plaintiffs allowed him to represent their interests as well as the interests of some of those dealing with them. He was permitted to represent conflicting interests. This was true when the accountants were there and when they were not. During the whole of the three months' period between audits, being a major part of the time, the plaintiffs paid out large sums of money without any investigation or examination of the books, though an examination would have disclosed the irregularities for which they now attempt to hold the defendants.

The actual liability of Mr. Zabriskie on open transactions and the amount to be paid out should have been ascertainable from the customers' ledger. The evidence shows that between February 28, 1917, and May 26, 1917, there was an actual change of position of something like $500,000. Were plaintiffs justified in relying, as reasonably prudent business men, on Moore's honesty, though he was allowed to exercise discretionary powers on behalf of customers? Moore was trusted with supervision over the department where the loss occurred and, at the same time, was permitted to deal at will for Zabriskie. He was left in the same position as to at least one other account. He was also margin clerk. As such it was for him to decide what margins should be maintained.

His various and diverse duties and powers put him in a position to keep records and papers or cause them to be kept so as to deceive the accountants who relied on him. If it be assumed that they should not have done so, it is nevertheless true that the plaintiffs

also relied upon them to an extent beyond all reason in view of all the circumstances. They were guilty of the same kind of negligence of which they now complain. It may be true that a proper accounting would have put the plaintiffs on guard with reference to Moore's wrongdoing, but it is also true that, if the plaintiffs had attended to their business and, in view of the large transactions involved, had looked up Zabriskie's account when payments were being made to him, the dishonesty of Moore would have been discovered.

The plaintiffs admit that they never inquired into the " opens " of Zabriskie when he asked for money, nor when he placed orders to be executed. Had they done so, nothing would have been paid to him other than as his margins warranted, and losing trades would have resulted in his account being closed. Instead they left these matters to an employee, who, though not a partner or principal, had full authority in his department.

It also appears that the accountants notified the plaintiffs in writing that a certain ledger should not be taken out of the control of one Hodge and that, if it took up too much of his time, an assistant should be engaged under his control. The accountants wrote the plaintiffs, " as this ledger is now operated, it is practically a check on the subsidiary departments and we see no advantage in establishing a separate ledger." Notwithstanding this advice, one of the partners put that ledger under Moore's direction, leaving him with control of every book in the office necessary to work his schemes and, at the same time, conceal his misdeeds.

Craig had knowledge that Moore was to have discretion as to Zabriskie's account. This is shown by a letter: " I enclose herewith check for $200 which please place to the credit of my account. I am not fully acquainted with the method of trading in cotton and wish to leave the operation of my account entirely in Mr. Moore's hands — with instructions to close out if the margin becomes exhausted."

It seems to us, therefore, that the loss was due to the failure of Moore to close out the account when the margin became insufficient. No matter what the accountants had reported, if Zabriskie's account had been closed there would have been no loss. True, it was not closed out because of the wrongdoing of Moore; but slight supervision would have disclosed Moore's wrongdoing.

Counsel for plaintiffs in his opening stated: " Moore got a man by the name of Zabriskie — we do not know Zabriskie except as a name on the books and as a witness in litigation that grew out of those transactions — that is our total acquaintance with Zabriskie — since Zabriskie wrote a letter to the plaintiff firm as then constituted — and you will understand me, of course, when I

say the plaintiff firm I mean Craig's firm, in which he enclosed a check for $200 which he said he wanted to trade in commodities, $200 will constitute a margin, that Moore was to do the trading for him, and that if the margin of $200 was exhausted, that was the end of the transaction."

Zabriskie was in fact better known to the plaintiffs than they would admit. Craig knew Zabriskie for about ten years, having spoken to him a number of times. In 1910 he took Zabriskie to a dinner of the Stock Exchange members, to which he invited all of his best customers. Craig raised Moore's salary because Zabriskie, a valuable customer, desired it and said he could obtain for Moore better compensation elsewhere.

Moreover, the Zabriskie account was the most active the plaintiffs carried. He did from seventy-five per cent to eighty-five per cent of their Chicago commodities business. Notwithstanding the tremendous loss which such an active account might bring to the plaintiffs, they never investigated the financial standing of Zabriskie; they never received a mercantile report on him; they never asked him for references in the face of the fact that his initial margin was about $200. During this period the plaintiffs paid Zabriskie $123,689.04 without once making an examination of the books to see whether anything was due him.

We are of the opinion that the loss was not entirely the result of the negligence of the defendants, but also resulted from the careless and negligent manner in which the plaintiffs conducted their business.

The verdict embraces two items: Money paid to Zabriskie and subsequent losses to his account which he failed to meet. These losses were paid to other brokers by Moore. They would not have been incurred if Zabriskie's account had been investigated. The purchases to which they relate would not have been made for there was no margin in Zabriskie's account to make them.

Before a payment was made to Zabriskie or an order given by or for him was executed, the " opens " and the sufficiency of his margin should have been investigated. This should have been done from day to day, at times from hour to hour, even though plaintiffs had audits from the accountants.

In *Deyo* v. *Hudson* (225 N. Y. 602, 615) the court said: " If they had no right to rely exclusively upon the assurance of Mitchell when they might have prevented the loss themselves they cannot recover."

There is no doubt in this case that plaintiffs could have prevented the loss by the exercise of reasonable care, and that they should not have relied exclusively on the accountants.

We think the damages cannot be said to flow naturally and directly from defendants' negligence or breach of contract. Plaintiffs should not be allowed to recover for losses which they could have avoided by the exercise of reasonable care.

In *City of East Grand Forks* v. *Steele* (121 Minn. 296) the court said (at pp. 298–300): "This is not an action in tort, but an action to recover damages for breach of contract. As said by Justice MITCHELL in *Whittaker* v. *Collins*, 34 Minn. 299, 25 N. W. 632, 57 Am. Rep. 55 (an action brought to recover for the negligence of a physician): 'Where the action is not maintainable without pleading and proving the contract, where the gist of the action is the breach of the contract, either by malfeasance or nonfeasance, it is in substance, whatever may be the form of the pleading, an action on the contract. * * * The foundation of the action is the contract, and the gravamen of it its breach.'

"The rule governing liability for breach of contract is given in the syllabus to *Sargent* v. *Mason*, 101 Minn. 319, 112 N. W. 255, as follows: 'In an action for damages for breach of contract, the defaulting party is liable only for the direct consequences of the breach, such as usually occur from the infraction of like contracts, 'and within the contemplation of the parties when the contract was entered into as likely to result from its nonperformance.' * * *

"The damages claimed on account of the losses resulting from the defalcations of the clerk and the insolvency of his surety are too remote to be recovered, without showing the existence of special circumstances, known to defendants, from which they ought to have known that such losses were likely to result from a failure to disclose the true condition of affairs. Such losses are neither the natural nor the proximate consequences of the failure of defendants to make a proper audit. Neither are any facts shown from which it may be inferred that a loss from either of these causes was or ought to have been contemplated, when the contract was made, as likely to result from a breach of duty on the part of defendants."

In *Saugerties Bank* v. *Delaware & Hudson Co.* (236 N. Y. 425, 430) the court said: "As I say this criminal act made it possible to use them; without it they could not have been used and the defendant's omission would have resulted in no harm.

"Under these circumstances I fail to see how it can be said that its omission was the proximate cause of plaintiff's injury. In the first place it has been found as matter of fact that it was not such proximate cause and ordinarily it is to be determined as a question of fact whether there has been such a connection

between cause and effect as to make the former proximate. (*Milwaukee & St. Paul Ry. Co.* v. *Kellogg*, 94 U. S. 469, 475.) But if we disregard this particular finding of fact we then have it on other findings that between defendant's omission and plaintiff's injury there has intervened the criminal act of a third party without which the injury could not. have occurred. There has been produced a great amount of legal literature and numberless opinions on this subject of proximate cause which it is impossible and undesirable to attempt to review. But I think that there is one fundamental rule which has been clearly established in the discussion of the subject which is decisive of this case, and that is the one that the act of a party sought to be charged is not to be regarded as a proximate cause unless it is in clear sequence with the result and unless it could have been reasonably anticipated that the consequences complained of would result from the alleged wrongful act; that if the consequences were only made possible by the intervening act of a third party which could not have reasonably been anticipated then the sequential relation between act and results would not be regarded as so established as to come within the rule of proximate cause."

In Sutherland on Damages (Vol. 1 [4th ed.], p. 158, § 41) it is said: " If there intervenes between the defendant's act or omission a wilful, malicious and criminal act committed by a third person, which act defendant had no reason to apprehend, the connection between the original wrong and the result is broken."

The plaintiffs, in effect, contend that defendants are chargeable with negligence because of failure to detect Moore's wrongdoing, wholly overlooking the fact that although they were closely affiliated with Moore, who was constantly under their supervision, they were negligent in failing properly to supervise his acts or to learn the true condition of their own business and to detect his wrongdoing.

We have reached the conclusion that the judgment is right and should be affirmed.

MERRELL and FINCH, JJ., concur; CLARKE, P. J., dissents.

CLARKE, P. J. (dissenting):

I dissent from the affirmance of so much of the judgment as sets. aside the verdict of the jury assessing the damages at $1,177,805.26. The contract of audit was not one merely to discover if inadvertent clerical errors had been made in the bookkeeping, but was one of protection of the plaintiffs' firm from their own failure to find any error in their books of account. This contract the defendants failed to perform. Admitting the neglect of the plaintiffs to

First Department, February, 1925.          [Vol. 212

discover the embezzlement and falsification of the accounts through an examination of the books on their own part, the defendants' work in pursuance of the contract, owing to the manner in which it was performed, failed to save plaintiffs from the consequences of such failure and neglect, which was the very subject of the contract.

Judgment and order affirmed, without costs to either party as against the other.