DELMAR VINEYARD et al.

v.

B. A. TIMMONS, C. P. A., et al.

No. 166.

Court of Appeals of Tennessee,
Eastern Section.

April 7, 1972.

Certiorari Denied by Supreme Court
Nov. 6, 1972.

of United Steel Workers of America a judgment in the amount of $153,688.80 for losses allegedly suffered as a result of Timmons & Company's negligently performing audits of the Union Store operated by Local 309.

Although the original bill has the sound of a tort action, it is an action for breach of contract and, in essence, a malpractice action. Complainants do not charge defendants with fraud but predicate their recovery on the grounds defendants negligently conducted audits of the Union Store. It is averred complainants have been "consistently misinformed for a number of years by the defendants as to the true and correct financial condition of the store operations in the following respects: (a) the accounts payable have been understated, and (b) the inventory has been overstated in cost value."

It is asserted as a direct result of defendants' "failures, negligence, and misconduct and Local 309's reliance thereon [understatement of accounts payable and overstated inventory], said association continued to carry on said mercantile operations under the same management and with the same policies in the mistaken belief that the operation had made and was making a reasonable profit, and was financially sound."

Defendants deny the inventory was overstated or that the accounts payable were erroneously reported.

In its answer defendants aver the markdown figure used in the inventory "was arrived at and agreed to by the complainants themselves through their officers and managers elected by the Union . . . . ."

As for the accounts payable, defendants say the "audit reflected all of the accounts payable made available through the Union and its store personnel at the time the audit was made and the accuracy of these accounts payable was verified by the defendants through accepted auditing procedures . . . . ."

Meares, Dungan & Jarvis, Maryville, O'Neil, Parker & Williamson, Key & Lee, Knoxville, for appellants.

Bird, Navratil & Ballard, Maryville, for appellees.

## OPINION

PARROTT, Judge.

Timmons & Company has appealed from the chancellor's decree awarding Local 309

Among other things, defendants assert as a defense:

"If the Union Store and Union itself lost any money as a result of the Store's operation, it was not due to any act or omission on the part of these defendants nor was it due to any breach of contract on the part of these defendants but same was due to the complainants own negligence in its election of management, its supervision of the business, its management of the Store's operation, its untimely and wasteful liquidation of the inventory and assets of the store, its participation in a fraud upon the defendants in failing to accurately advise them of all of the accounts payable and the true value of the inventory."

After hearing all the proof, the chancellor found defendants had breached their contract by negligently conducting audits for the years 1965, 1966 and 1967. He further found that as a result of the defendants' erroneously reporting the accounts payable and using a different mark-down and mark-up percentage on the inventory for the years 1965, 1966 and 1967 from the preceding years without disclosing such, complainants suffered damages of $153,688.80 ˙for which amount judgment was entered.

Local 309 organized and commenced operating the Union Store in 1957. The store was of the general department type engaged in the retailing of clothing, toys, shoes, etc. It was operated continuously from its organization until it closed in July 1967. In all of the years of its operation, except 1965, the store showed a book profit. Apparently in 1967 there was some concern among the membership of Local 309 about the operation of the store because immediately after the election of a new slate of union officers, the store was closed.

The constitution and by-laws adopted by Local 309 creating the store provided "the objective of the organization is to make goods available to members at a substantial saving." The constitution and by-laws place the responsibility of operating the store in a four-man committee which must be considered and deemed as owners so far as this case is concerned.

Since the organization of the store in 1957, defendant, Timmons & Company, has conducted annual audits of the Union Store. At all times the inventory was taken by the Union Store employees under the supervision of Timmons & Company. The merchandise was inventoried at its marked price of sale and was then extended or adjusted by using a mark-up—mark-down percentage in arriving at the true value of the inventory. For the years 1962, 1963 and 1964 a mark-up of 25% and mark-down of 20% was applied to the inventory with a profit being shown for these years. In 1965 a mark-up of 11.1% and a mark-down of 10% was used and the audit revealed the business had suffered a $3,189.-21 loss. For the year 1966, a mark-up of 19.1% and a mark-down of 16% was applied to the inventory and for the year 1967, a mark-up of 10% and a mark-down of 9% was used. In these two years the store also showed a book profit.

It is the complainants' contention and apparently the chancellor agreed that the defendants changed the inventory valuation mark-up and mark-down percentages from preceding years without disclosing same to complaints. Our review of this record shows the proof does not support such but contrarily, the mark-up and mark-down percentages were agreed upon by management, store committee and the accountants. C. W. McSpadden, Timmons' employee who was in charge of the audit for the three years in question, testified that the manager and the members of the Union Committee who so far as this lawsuit is concerned must be considered as if they were the owners, were consulted as to the mark-up and mark-down percentages which were arrived at by agreement.

James R. Brown, chairman of the store committee during the entire period of time,

1965, 1966, 1967 and for several years prior, denies the percentages were ever agreed upon. With all due deference to Mr. Brown's denial, we find his testimony to be uncertain about many material things making it impossible for us to accept his denial of the mark-up and mark-down percentages being discussed with the store committee and management. Apparently in earlier years the accountants required the store committee and manager to sign a statement that they "unanimously agree that to the best of their knowledge ____ (%) ____ mark-up is an accurate estimate to use in arriving at the inventory cost of the above date" but no such statements were procured for the years 1965, 1966 and 1967. Mr. Brown admits signing prior statements but says that such certificate "was for government purposes as they explained it to me." He does not remember signing any certificates as to the value of the inventory and said if he did, he did not know what he was signing. In the record for each of the years in question is a certificate signed by Mr. Brown certifying that the inventory furnished was correct to the best of his knowledge and belief.

The testimony of Vernon Scarbrough, manager of the store during the years in question, is contrary to Mr. Brown's denial and supports Mr. McSpadden's testimony that the mark-up—mark-down percentages were discussed with the store committee and agreed upon. It was his testimony that the accountants and store committee always had a meeting at the time the audit was made and that Mr. Brown as chairman of the committee was always in the meetings and other committee members also would attend. He testified that in these meetings "we would discuss the operation that we had had for the year, the markdowns that we had taken and what we felt was the correct figure that needed to be used on the cost of merchandise."

Mrs. Ruth McClanahan, the bookkeeper for the past several years, including the years 1965, 1966 and 1967, testified that at the time of the taking of the inventory and during the period of time when the audit was being made Mr. Brown was always present and as a usual thing some of the other men on the store committee helped take the inventory.

We think the unimpeached testimony of the store's manager, bookkeeper and defendant's employee McSpadden pertaining to the inventory outweighs the store committee chairman Brown's denial that during the years in question there was no agreement or knowledge by the store committee of the mark-up and mark-down percentages applied to the inventory.

To support their contention the accountants overstated the inventory, complainants offer as proof an audit made by accountants, King & King, after the store closed in July. Naturally an inventory taken on a different date would not be the same as an inventory taken on another date. Further, both the bookkeeper, Mrs. McClanahan, and her assistant, Carolyn Jones, pointed out that King & King, in taking their inventory, did not use the marked price of each item as was used in the inventory made under the supervision of Timmons & Company. King & King would take the marked-down items on the shelves and if there were other items of identical nature, such as shirts, etc. not marked down, these items were also recorded at the marked down selling price.

■ We think the evidence clearly shows management and the store committee [which must assume the same position as owners] were not only aware of the method of which the inventory was taken but participated and agreed on the percentages of mark-up and mark-down. Since the store committee not only was informed but participated and agreed on the inventory, they cannot be permitted in law or equity to now claim losses on the grounds of misrepresentation on the part of defendants. Further, we do not find any credible evidence showing defendants overstated the inventory.

This brings us to the question of whether or not defendants erroneously reported the accounts payable. We do not think it is necessary to unduly lengthen this opinion by setting out numerous figures and discussing various individual accounts payable but it suffices to say the evidence shows there were errors and omissions in the defendants' report of the accounts payable for at least the year 1967. However, these errors and omissions of the accounts payable, standing alone, do not necessarily impose liability but raise other questions which must be answered before complainants are entitled to a recovery of damages. Was there sufficient reason shown to arouse the accountants' suspicion that not all accounts payable were being reported so as to require a further independent investigation? Did the defendants' omission and errors result from their negligence and constitute a breach of contract? Did management and the store committee properly perform their duty in regard to the accounts payable? Did the store committee rely upon the defendants' report of accounts payable? Under the applicable rules of law which are hereinafter stated, an affirmative answer must be found to the above questions before complainants are entitled to a recovery.

From the exhibits introduced there is documentary proof showing in at least some instances accounts payable were not included in defendants' worksheet or audit.

The method used in obtaining accounts payable was a simple but rather clumsy procedure. It was the policy and custom for management to keep an alphabetical index file in which all invoices for accounts payable were placed. From this alphabetical file the accountants would go through the invoices and statements and determine with management the number of accounts payable and the total amount. One can readily see that by using such a procedure with no further investigation, accounts payable could easily not be included in the audit if the invoices were not in the file.

Nevertheless we do not find sufficient credible evidence to accurately determine either the understatement of the accounts payable by the defendant or to determine the true amount of accounts payable on July 31, 1967. For the year ending January 31, 1967, Timmons' audit reports accounts payable to be $73,101.15. Listed on Mr. McSpadden's worksheet are some 70 different accounts.

King & King's audit made in July 1967 listed some 120 accounts payable totaling $198,809.22 as of that date. King & King took its July 1967 audit and attempted to reconstruct from the store records, including invoices, statements, disbursement journal entries, what the accounts payable were on January 31, 1967, 1966 and 1965. According to King & King's forecast, by using the heretofore mentioned data, they found the Union Store owed on January 31, 1967, some 89 suppliers $166,729.80 including some $10,000.00 worth of merchandise that had not been received.

Counsel for the Union Store sent interrogatories or questionnaires to all the store's known suppliers. Answers were not received from all of these suppliers but from those received for the year 1967, it was estimated the store owed accounts payable on January 31, 1967 of $143,359.00.

Mr. McSpadden testified that in his opinion it would be impossible to take the store records as King & King did and accurately and correctly determine the inventory or accounts payable on a specific prior date. After searching through this voluminous record and the maze of exhibits filed, at the same time recognizing we are not experts in the accounting field, we tend to agree with Mr. McSpadden's opinion. Conceding that defendants' employee McSpadden failed to include all accounts payable in his audit, the proof offered by the complainants through the King & King forecast and the interrogatories to suppliers is in our opinion not sufficient credible evidence but is nebulous proof of the accounts payable on the dates in question.

It was a store policy and custom that goods in transit or on order were not included in inventory or accounts payable until received and placed on the shelves for sale. Many invoices and some statements were received in the Union Store long before the merchandise was ever received. These invoices and statements were placed in the alphabetical file but were not included in accounts payable and inventory unless management verified to the accountant the goods were on hand. Under these circumstances it appears that King & King could not possibly know from the data used in making their forecast whether the goods were on hand or not. The fact that the accounts payable on July 1967 totaling $198,809.22 as against the Timmons figure of $73,101.15 on January 31, 1967 is not significant. Readily it can be seen it is almost six months between the King & King and the Timmons audits. It is undisputed that as inventory is increased, accounts payable accordingly become greater. Also, it is shown that the store policy was to purposely attempt to achieve the lowest inventory possible in the month of January just before the time of taking the annual inventory and audit.

We are not hesitant to agree with the chancellor that the defendants were careless in their investigation procedure in regard to the accounts payable. However, whether this careless and inaccurate report on the part of the defendants caused the complainants' loss presents a much more difficult question. Even though a proper and accurate audit would have disclosed facts leading to the discovery of the defendants' carelessness, there are a number of things which show that the defendants' negligence was not the direct cause of the loss.

Several members of the store committee, including Chairman Brown, for the years 1965, 1966 and 1967 testified. Without exception, these members of the store committee offered no proof that they in any way relied upon the defendants' audit. Chairman Brown says he read the audit and reported the contents to the executive board and the body of the local union. He admits being concerned as a result of the $3,000.00 loss in 1965 but says he was not empowered or had a duty to do anything but report the findings to the executive committee. With the exception of committeeman Martin Headrick who says he read the audit and kept a copy in his desk drawer and Jack Richesin [in the bill of exceptions referred to as Richardson] who does not remember the 1965 loss but says reports were passed around at meetings, all other several members of the committee testifying made no mention of reading, studying or relying upon defendants' audit. Conceding the defendants negligently performed their duty in auditing the accounts payable, we find absolutely no evidence to support complainant's insistence that it was deceived by these audits and reports. In the absence of any showing the complainants relied upon the defendants' audit, it becomes impossible to show complainants' damages were a direct consequence of defendants' negligence or breach of contract.

Moreover, there is proof which indicates complainant's losses resulted from its method of operation of the store and disposition of the inventory after the store closed. From the time of organization of the Union Store, it appears the business was under capitalized. At the time of organization, Local 309 capitalized the store with a $110,000.00 loan. By the end of calendar year 1964 the store had paid back to the union $40,000.00 of the original investment. Subsequently Local 309 charged off the remaining $75,400.00 owed by the store on the capital investment. During the entire operation from 1958 until 1967 the store had difficulty meeting its accounts payable. This difficulty came in part from the under capitalization and the fact that the store was continuously increasing the value of its inventory.

After the store was closed, bids were taken on the balance of the stock of goods. The entire inventory which King & King reported to be valued at $222,370.80 in July

1967, and which at least one other witness estimated to be valued as high as $300,000.-00 was sold to Wynn Enterprises for $108,000.00 cash. In addition to this cash, Wynn Enterprises entered into an agreement with Local 309 to pay $1500.00 per month rent on the building plus 10% of the gross profits of the store. If King & King's valuation of the inventory at $222,370.80 correctly reflected the cost and value of the merchandise on hand at the time the store was closed and the merchandise had been sold at the inventory figure plus a $21,000.00 tax refund, it appears the Union Store would have had a surplus instead of a loss.

The chancellor in his memorandum opinion not only speaks of the complainants being misinformed and misguided but finds the defendants did not use the proper professional skill or standards or exercise the necessary independent attitude or investigative processes required of accountants.

■ Generally, it is established law throughout this country that an accountant does not guarantee correct judgment, or even the best professional judgment, but merely reasonable care and competence. Bloch, Inc. v. Klein, 45 Misc.2d 1054, 258 N.Y.S.2d 501; Gammel v. Ernst & Ernst, 245 Minn. 249, 72 N.W.2d 364, 54 A.L.R.2d 316; Maryland Casualty Co. v. Cook, D.C., 35 F.Supp. 160; 54 A.L.R.2d 324.

■ The standard of care applicable to the conduct of audits by public accountants is the same as that applied to doctors, lawyers, architects, engineers and others furnishing skilled services for compensation and that standard requires reasonable care and competence therein. Accountants owe a legal duty to their employer to make reports without fraud and a contractual duty to make them under the terms of the contract with care and caution required by the standards of their profession. 1 Am. Jur.2d, Accountants, Sec. 15; 54 A.L.R.2d 328.

As to accountants being held liable for breach of contract, we do not find any ap-

plicable Tennessee decisions. Therefore, we must look to decisions in other jurisdictions. The chancellor cites in his memorandum and the Union in its brief the cases of Maryland Casualty Co. v. Cook, D.C., 35 F.Supp. 160; National Surety Corp. v. Lybrand, 256 App.Div. 226, 9 N.Y.S.2d 554; Ultramares Corp. v. Touche, 255 N. Y. 170, 174 N.E. 441. These cases are not suits by owners of a business seeking damages from auditors hired by the owners, nor do these cases hold or stand for the principle that the owner of a business will be permitted to recover business losses because an accountant hired by the owner to conduct an audit negligently performs his duty.

The case we think closest in point and applicable to this case is the New York case of Craig v. Anyon, 212 App.Div. 55, 208 N.Y.S. 259. In that case the plaintiffs, New York stockbrokers, sued its accountants alleging that the defendant accountants negligently conducted an audit of plaintiffs' books and accounts resulting in the plaintiffs' suffering damages in the sum of $1,280,233.61. The court found there was little doubt as to the carelessness and negligence on the part of the auditors but refused to let plaintiff recover for the losses. In reaching the above conclusion the Court said:

"There is no doubt in this case that plaintiffs could have prevented the loss by the exercise of reasonable care, and that they should not have relied exclusively on the accountants.

"We think the damages cannot be said to flow naturally and directly from defendants' negligence or breach of contract. Plaintiff should not be allowed to recover for losses which they could have avoided by the exercise of reasonable care."

See also Deyo v. Hudson, 225 N.Y. 602, 122 N.E. 635; City of East Grand Forks v. Steele, 121 Minn. 296, 141 N.W. 181; Gammel v. Ernst & Ernst, 245 Minn. 249, 72 N.W.2d 364; Flagg v. Seng, 16 Cal.

App.2d 545, 60 P.2d 1004; Social Security Admin. Baltimore F. C. U. v. United States, D.C., 138 F.Supp. 639.

█ In the instant case we disagree with the chancellor and hold that the evidence does not show that the complainants' damages directly resulted from the defendants' negligence or breach of contract. To the contrary, we believe the evidence does preponderate in favor of the conclusion that a greater part of complainants' losses stem from its own management of the store and its disposition of the inventory after the store was closed in July 1967.

██ It is generally recognized that a public accountant may be held liable on the principles of negligence, to one with whom he is in privity or with whom he has a direct contractual relation, for damages which naturally and proximately result from his failure to employ the degree of knowledge, skill and judgment usually possessed by members of his profession. In other words, if from a lack of skill or from negligence, an accountant fails to disclose the true status of accounts he is employed to audit, he is liable for the damages that are shown to proximately or naturally result from such failure. 1 Am.Jur. 2d, Accountants, Sec. 15; 54 A.L.R.2d 328, 329, Sec. 3(a); Ryan v. Kanne, Iowa, 170 N.W.2d 395; City of East Grand Forks v. Steele, 121 Minn. 296, 141 N.W. 181; Board of County Com'rs of Allen County v. Baker, 152 Kan. 164, 102 P.2d 1006.

This record just does not contain sufficient credible evidence to warrant a conclusion that defendants' errors or omissions were the proximate cause of all the damages for which complainants seek to recover in this suit. We have heretofore pointed out that the store committee, including its chairman, Mr. Brown, placed little or no reliance upon the defendants' audit. For the most part, members of the committee did not even read the audit, much less study ·or place any reliance on its contents. It is our opinion the complainants' claim that their reliance on de-

fendants' audit caused them to remain in business and suffer the alleged losses is without merit and wholly unsupported by credible proof.

Further, we are not able to say the evidence preponderates in favor of a finding the defendant did not use proper auditing procedures or acceptable professional standards required of accountants. In this record we have the testimony of several qualified, respected accountants, all of whom, except the members of the King & King firm, testified that defendants did use, under the circumstances and conditions, accepted and proper procedures. Moreover, we think it is significant that after the 1965 loss was reported, the local union requested its International Union to furnish an auditor to examine the records and procedures being used at the store. The report of Charles G. Cainlake, International Auditor, was filed as an exhibit in this record. In his transmittal letter it is stated that an examination of the accounting procedures used from April 1, 1957 to January 31, 1965, was made. He describes the work of Timmons & Company as being "very fine." In his analysis it is said: "The records and books of accounting at present are excellent, in direct contrast to the records kept in the early years which were inadequate."

Thus it is our opinion the complainants have proven defendants did make some errors and omissions in reporting the accounts payable for at least the year 1967. Notwithstanding this showing of negligence on the part of the defendants, we are of the opinion and hold the complainants have failed to prove their loss flows naturally, directly and solely from the defendants' negligence or breach of contract.

Accordingly, the judgment as rendered by the chancellor is reversed and the cause dismissed with the costs taxed to appellee.

COOPER, P. J. (E. S.), and SANDERS, J., concur.