450 So.2d 1216 (1984)
DEVCO PREMIUM FINANCE COMPANY, a Corporation, Appellant/Cross Appellee,
v.
NORTH RIVER INSURANCE COMPANY, a Foreign Corporation; Paul G. Miller, Jr., Robert E. Holley, and Miller & Holley Chartered, a Professional Corporation, Appellee/Cross Appellant.
No. AV-46.
District Court of Appeal of Florida, First District.
May 18, 1984.
Noah H. Jenerette, Jr., James H. McCarty, Jr., Karen K. Cole of Boyd, Jenerette, *1217 Staas, Joos, Williams & Felton, P.A., Jacksonville, for appellant/cross appellee.
G. Kenneth Norrie and E. Allen Hieb, Jr. of Rogers, Towers, Bailey, Jones & Gay, Jacksonville, Robert M. Greco of Karon, Morrison & Savikas, Ltd., Chicago, Ill. and Rudolph J. Inman, Jr. of Inman & Landau, Jacksonville, for appellee/cross appellant.
MILLS, Judge.
We are asked in this appeal to determine whether an accounting firm is entitled to assert the defense of comparative negligence in a malpractice action instituted against the firm by a client. We agree with the trial court that the firm is entitled to assert such a defense.
Devco Premium Finance Company (Devco) served clients who desired to purchase insurance policies but who could not afford to pay the initial lump-sum premiums on those policies. Each client paid to the agent of the insurer a stated percentage of the lump-sum premium, generally 30 percent, and Devco then paid the insurer the remainder of the premium. In return for Devco's payment to the insurance company on behalf of the client, the client: (1) agreed to make monthly payments to Devco, amortizing the balance due on the premium plus interest; (2) assigned the unearned premium held by the insurance company to Devco as a security interest; and (3) provided Devco with a power of attorney. When a client failed to make a monthly payment, Devco used its power of attorney to cancel the client's insurance policy. Upon cancellation, the insurance company refunded to Devco the portion of the client's premium which was as yet unearned. Devco thereby protected itself from loss because the premium returned by the insurance company should always be greater than the amount owed by the client to Devco.
Timely notification to the client that he was in arrears on his payment and prompt cancellation of the insured's policy upon the insured's failure to become current in his payments were critical to the success of Devco. Because Devco did not subject its clients to credit checks and did not require the pledge of collateral, its only security lay in the interest which it held in the client's unearned premium. If it failed to promptly cancel the insurance policy of a client who defaulted on his payments, more of the premium would be earned by the insurance company, and Devco stood not only to lose its profit but also its initial investment.
Initially, Devco subscribed to a monthly computer service which provided it with reports of the aging of its accounts receivable. The reports showed the accounts receivable on which payments were 0 to 30 days overdue, 31 to 60 days overdue, and more than 60 days overdue. Devco received these monthly computer aging reports from 1976 through May 1980. On 1 June 1980, Devco began converting to an in-house computer system. Although the problem had existed before the conversion, the company soon began to experience severe problems with failure to properly cancel delinquent accounts. Although Dan Crisp, the President of Devco and a member of its Board of Directors, had available to him the monthly printouts with their aging schedules from 1976 through May 1980, he never reviewed them during that time.
Paul G. Miller and Robert E. Holley, certified public accountants, operating under the firm name of Miller & Holley, audited the financial records of Devco for the fiscal years ending 30 June 1979 and 30 June 1980. Mike Latimer, an employee of Miller & Holley, actually performed most of the audits.
During the 1979 and 1980 audits, Miller & Holley devised a statistical confirmation test to determine the number and size of doubtful accounts receivable. Latimer omitted numerous pre-1980 contracts from the sample used for this test even though those contracts were still outstanding and were included as accounts receivable on the company's financial statements. Miller & Holley relied upon the opinion of Gladys Tillman, manager of Devco, as to the collectibility of these pre-1980 accounts which *1218 were omitted from the confirmation sample used. Latimer selected 240 Devco accounts receivable to test by confirmation procedures in both the 1979 and 1980 audits. It appears, however, that in each year he in fact tested only 100 of the 240 accounts and neglected to test the remainder because he concluded, after completing the 100 accounts, that no problems existed. In fact, many of the accounts selected for testing were deficient. Of the 100 accounts actually tested by Latimer in one of the years, 80 were debit accounts on which payments from the client were owed. Of these 80 accounts, 27 were accounts on which the security  the unearned insurance premium  had been lost. Miller & Holley ignored the results of the statistical sample testing and instead established a doubtful accounts receivable allowance of .5% of the outstanding premium contracts receivable.
In June 1981, Dan Crisp learned for the first time that Devco was no longer a profitable operation. He had believed from his review of the Miller & Holley audits performed on 30 June 1979 and 30 June 1980 that Devco had sound accounts receivable and was a thriving business. Crisp first became aware of the serious delinquent accounts problem when an employee showed him a computer printout indicating that $500,000 worth of accounts receivable were delinquent more than 90 days.
Florida National Bank had extended $700,000 credit to Devco in reliance upon the audited financial statements prepared by Miller & Holley. The bank determined the line of credit which it would extend to Devco by calculating a percentage of the nondelinquent accounts receivable. In 1981, Edward M. Clay, a Florida National Bank Commercial Loan Officer, reported to the bank loan committee that $632,179.93 of the Devco accounts receivable previously presumed collectible were in fact over 90 days old and should not be considered as collateral. Clay then notified Devco by letter that it would need to infuse between $325,000 and $400,000 in additional capital to secure its line of credit. When Devco was unable to provide this additional capital, Florida National Bank called in its line of credit loan, causing Devco to liquidate.
By way of amended complaint, Devco alleged that Miller & Holley negligently prepared its audits of 30 June 1979 and 30 June 1980 and that Devco had suffered damages as a result of its reliance on them. After a nonjury trial in which expert testimony was presented by both sides, the trial court made the following findings of fact, with which we concur:
C. The financial statements submitted by Miller & Holley included expressions of opinions that the accompanying balance sheet and statements of earnings, etc., presented fairly the financial position of Devco at fiscal years' ends; and those submissions further stated that those opinions were expressed after examinations of Devco's books and records "made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances." The values of the company's assets, specifically its premium contracts receivable (PCR's), were substantially overstated because of a failure on the part of company personnel to timely cancel insurance policies when the insured failed to make the installment payments required by his contract with the company. It is those facts which make this case unique. To a material degree, the gross amounts owed Devco by the insureds who were its debtors were correctly stated in the financial statements. Devco's financial problems arose and this suit ensued when it was discovered that those accounts receivable, though existent, were virtually without value. All parties, i.e.: management and the auditors, were aware, or should have been aware, of the fact that collections of most of the balances due on PCR's became highly unlikely if timely cancellation for non-payment was not effected.
D. Generally accepted auditing standards require an independent auditor to *1219 perform a number of functions, included among which are: (a) the testing of accounts receivable; and (b) communication of material weaknesses in internal accounting control that come to his attention to senior management or the Board of Directors. The performance of the latter function, however, is only an incident to the auditor's objective in making an examination of financial statements, which is to form the opinion relating to the fair presentation of financial position, etc. And the existence of the duty to perform that function does not relieve management of its responsibility for the establishment and maintenance of a system of internal accounting control nor does it convert the auditor into something of management's agent who must police the system created by management. The evidence in this case, at any rate, does not establish that any material weakness in Devco's internal accounting control ever came to the attention of Miller & Holley. What the evidence does disclose is that had Miller & Holley adequately and properly tested Devco's accounts receivable, the material weaknesses in `the internal accounting controls established and maintained by management would have been earlier revealed; and the awareness of the existence of those weaknesses would have provided management an opportunity to take remedial action.
E. Because of the small size of the balances due on most of the PCR's, Miller & Holley, through Miller, chose not to canvas all accounts, opting instead to canvas a statistical sampling for its test results. That procedure was reasonable. Whether the entire field from which the test samples were chosen was complete or not is of no moment because the test results which were produced contained a sufficient number of discrepancies and informational voids to lead any prudent auditor to conduct further inquiry. Such inquiry would have led to an examination of the individual files/payment records and would have readily disclosed that proper cancellation procedures were not being followed. Miller & Holley did not conduct appropriate further inquiry, even though its own work papers suggested the necessity therefor.
F. Both Devco's senior management and its Board of Directors relied heavily on both the financial statements (audited) and on the monthly "write up services" (unaudited) presented by Miller & Holley during calendar 1978, 1979 and 1980. They did so to an unwarranted degree. Each of them paid a great deal of attention to the size (growth) of the company's receivables as a composite; but neither, as it should have, took the steps necessary to assure availability of the aging reports which would have provided the quality control vital to the life of an insurance premium finance company. Under its contract with an insured, Devco acquired the right on behalf of the insured to cancel any policy if the insured was 10 days late in the making of any installment payment. Prompt cancellation, with the resultant refund of unearned premium, resulted in no loss to Devco. Prudent insurance premium finance company management regularly employs aging reports prepared monthly, and those reports are ordinarily prepared by company employees.
G. Devco compounded its problems by attempting to install an in-house computer system without adding the personnel necessary to assure an orderly conversion. The result was that the problems of tardy cancellations were increasing at an alarming rate when growth was deceptively encouraging, but quality controls were non-existent. For the period June 1980 through approximately January 1981 management had virtually no computer print-outs available to it, and back up systems were not in place.
The trial court further found that the damages suffered by Devco as a result of the negligence of Miller & Holley were limited to "diminished values in accounts receivable." Fault was apportioned at 80% on the part of Devco and 20% on the part of Miller & Holley.
*1220 The only reported case in Florida dealing with an accountant's malpractice liability to his client is Dantzler Lumber & Export Co. v. Columbia Casualty Co., 115 Fla. 541, 156 So. 116 (1934), where it was held that auditors and accountants occupy a relation of trust and confidence to their employer based upon their superior knowledge of accounting and auditing principles. That case did not address the effect of the client's contributory negligence, and, indeed, there have been relatively few such cases reported throughout the United States. See generally, Annot., 92 A.L.R.3d 396 (1979).
In arguing that auditors are not entitled to assert the defense of comparative negligence, Devco relies principally upon and urges that we adopt the holding of National Surety Corporation v. Lybrand, 256 A.D. 226, 9 N.Y.S.2d 554 (1939), which was that "[n]egligence of the employer is a defense only when it has contributed to the accountant's failure to perform his contract and to report the truth." 9 N.Y.S.2d at 563. We decline to adopt that holding because Lybrand was decided on principles of contributory negligence, a doctrine which has been repudiated in this State. Hoffman v. Jones, 280 So.2d 431 (Fla. 1973). Rather, we believe the better rule is the one adopted in Craig v. Anyon, 212 A.D. 55, 208 N.Y.S. 259 (1925), that "[p]laintiffs should not be allowed to recover for losses which they could have avoided by the exercise of reasonable care." 208 N.Y.S. at 268. Accord, Delmar Vineyard v. Timmons, 486 S.W.2d 914 (Tenn. App. 1972). Therefore, we hold that the trial court did not err in allowing Miller & Holley to assert the defense of comparative negligence, nor in assigning 80% of the fault to Devco.
During opening and closing argument, Devco admitted that Miller & Holley was not responsible for $130,000 worth of the delinquent accounts. Miller & Holley argues that the trial court erred in the amount of damages it awarded because it failed to subtract the $130,000 from the total damages figure. We are unable to determine from the record whether these damages were in fact deducted. Therefore, we remand this case to the trial court with instructions to deduct, if it has not already done so, the $130,000 from the total damages suffered by Devco.
Affirmed in part, reversed in part, and remanded with instructions.
SMITH and NIMMONS, JJ., concur.