**UNION PLANTERS CORPORATION, a Tennessee Corporation, and Union Planters National Bank of Memphis, a National Banking Association, Fifth-Party Plaintiffs and Appellants,**

v.

**PEAT, MARWICK, MITCHELL & CO., a Partnership; Walter E. Hanson, and Dale H. Bullen, Fifth-Party Defendants and Appellees; Sixth-Party Plaintiffs and Appellants,**

v.

**C. Bennett HARRISON, James C. Merkle, William M. Matthews, Jr., and James A. Cook, Jr., Sixth Party Defendants and Appellees.**

Court of Appeals of Tennessee,
Western Section, at Jackson.

Jan. 26, 1987.

Application for Permission to Appeal
Denied by Supreme Court
June 29, 1987.

G. Wynn Smith, Jr. and Mark Vorder Bruegge, Jr., of Wildman, Harrold, Allen,

Dixon & McDonnell, Memphis, for Union Planters Corp., et al.

W. Emmett Marston, David Wade, and William J. Landers, of Martin, Tate, Morrow & Marston, P.C., Memphis, and Sidney Davis, Steven M. Edwards, and George F. Hritz, of Davis, Markel, Dwyer & Edwards, New York City, for Peat, Marwick, Mitchell & Co., et al.

Frank J. Glankler, Jr. and John I. Houseal, Jr., of Glankler, Brown, Gilliland, Chase, Robinson & Raines, Memphis, for C. Bennett Harrison and James C. Merkle.

George W. Morton and Ellis A. Sharp, of Morton, Lewis, King & Kreig, Knoxville, for C. Bennett Harrison.

TOMLIN, Presiding Judge, Western Section.

Plaintiff, Union Planters Corporation (hereafter "UP") appeals from an order granting defendants' motion for summary judgment in a suit brought by it in the Circuit Court of Shelby County against Peat, Marwick, Mitchell & Company and others (hereafter simply "PMM"). UP, by its action, had sought damages from PMM for a breach of contract. The singular issue presented by this appeal is whether the trial court was in error in granting summary judgment. We hold that granting summary judgment was error and remand for a trial on the merits.

UP filed a fifth-party complaint against PMM in 1979 in connection with involved litigation that began in 1976 concerning fraudulent and improper banking practices on the part of some of its employees. UP contended that PMM contracted to perform the accounting service of auditing its financial statements at the close of each and every year beginning with the year 1971, reporting thereafter to UP's board and stockholders as to its financial condition. UP further contended that PMM was obligated (a) to test the effectiveness of its "internal control," i.e., the procedures and mechanism utilized by it to prevent the occurrence of fraud and to assure UP that sound loans were made; (b) to investigate and obtain sufficient evidence as to the collectability of its outstanding loans and other reported assets; and (c) to use due care on its part in performing these and other required auditing procedures. UP further alleged that relative to that particular contract, PMM represented that it had special expertise and would exercise a high degree of care to perform an even more complete and continuous investigation than that required in the usual financial statement audit, assist UP in upgrading its internal auditing procedures, and perform an even more complete and continuous review of loan assets.

There have been many "side trips" taken in this litigation that are irrelevant to the issue before us. Ultimately PMM filed its answer admitting that it contracted to audit UP's annual financial statements from 1971 through 1978. It denied undertaking any additional duties, along with denying any breach of its contract with UP or causing any of its losses. In addition, PMM alleged that employee dishonesty was a cause of UP's losses.

In June, 1983 PMM filed a motion for summary judgment which related only to its indemnity and contribution claims against two of UP's officers.[1] A year later PMM amended its summary judgment motion seeking the dismissal of UP's claims for recovery of its loan losses. Following a hearing, the trial court granted PMM's motion for summary judgment on the primary claim then remaining in the lawsuit—UP's suit for recovery of its loan losses. UP then filed a motion to reconsider the trial court's order granting summary judgment and for leave to amend its complaint. Both requests were denied. This appeal followed.

The contract between UP and PMM was an outgrowth of a decision by UP to have its annual audits done by an outside accounting firm rather than in-house. Negotiations were begun between officers of UP and principals of PMM in 1971. By late 1971, following numerous conferences and correspondence, UP employed PMM to perform auditing and continuous management consulting services beginning at year end

---

1. These indemnity claims were later nonsuited.

and continuing on a yearly basis. The agreement was terminated by the resignation of PMM in October, 1978.

During the period between July, 1973 and July, 1974, UP suffered losses from bad loans totaling several million dollars principally and primarily due to the fraudulent and otherwise improper lending practices of two employees, each of whom was later tried and convicted in federal court. At the time suit was filed it was the contention of UP that had PMM lived up to its contract, the existing weaknesses in the operation of the bank would have been detected and corrective operating procedures adopted and internal controls installed to eliminate the problem.

The contentions of UP are best expressed in the relevant portions of its complaint:

## THE BREACH OF CONTRACT

"25. The breach of contract of which Bank complains in this cause, and which is set forth specifically below, generally consisted of a course of conduct followed by PMM whereby, in violation of their contract of employment, it failed to provide an ongoing objective evaluation of the functioning of the Bank's various operating systems, including its systems of internal control as defined herein, in an expert professional manner commensurate with the level of skill, competence, expert knowledge and diligence which had been promised and, by virtue of such failure, failed to call to the attention of the Bank's board of directors certain weaknesses in such operating systems and systems of internal control which required immediate remedial action in order to safeguard the assets of the Bank. Such weaknesses in operating procedures and in internal controls were of such a serious nature that their detection, and reference to the board of directors for appropriate corrective action, by PMM not only was within the contemplation of the parties in entering into the aforesaid contract for auditing and management consulting services but, indeed, was known to the parties, from the outset, to be one of the significant reasons for which PMM was

engaged and paid in excess of $1,000,000.00 to perform such services.

"26. Such failure on the part of PMM to perform such services in the manner in which it had contracted to do so constituted a continuing breach of its contract of employment commencing sometime in mid-1972, the exact date being unknown to Bank, and was continuous through and including the end of the second quarter of 1974, at which time, through its own efforts and independently of PMM, Bank was able to discover and to remedy the various significant weaknesses in its operating procedures and system of internal controls which PMM, pursuant to its contract, previously should have discovered and reported to the board of directors for remedial action.

"27. Although the breach of contract complained of herein was continuous from mid-1972 through and including the end of the second quarter of 1974, Bank claims no damages in this cause which did not result directly from the breach of said contract which occurred between July 3, 1973, and June 30, 1974.

"28. PMM breached its contract with Bank by its continuous failure to utilize auditors and other personnel to perform the auditing and management consulting services contracted for who had the necessary skills and experience in bank operations to perform such services in a competent manner and in a manner commensurate with the degree of skill, competence and expert knowledge which it had contracted to possess, or even which normally would be possessed by Certified Public Accountants in the performance of bank auditing and management consulting work in that:

(a) It continuously failed to assign adequate supervisory personnel to staff the engagement, and

(b) The personnel assigned by it to perform the specific audit tasks did not have significant exposure to bank auditing, controls and sound banking practices prior to being assigned to work on the Union Planters account and therefore were not competent to

perform the tasks assigned to them of review and evaluation of Bank's operating and auditing procedures or assessment of the functioning of Bank's systems of internal control.

"29. PMM breached its contract with Bank by its continuous failure to perform reviews of the Bank's overall lending policies and practices, past history, minutes of various loan committees and other data regarding credit quality in a manner commensurate with the level of skill, competence, expert knowledge and diligence which it had contracted to possess and exercise, or even which normally would be possessed and exercised by Certified Public Accountants in the performance of bank auditing and management consulting services in that:

(a) It failed to identify and disclose the need for a uniform procedure for identifying and avoiding excessive concentrations of credit to a single borrower or a group of related borrowers, and

(b) It failed to aggregate extensions of credit to related borrowers in order to identify and disclose excessive concentrations of credit in a timely fashion, and

(c) It failed to identify and disclose the need for specific policies regulating the volume of outstanding installment, commercial, and real estate loans, and

(d) It failed to review the composition of the installment, commercial, and real estate loan portfolios and disclose, in a timely fashion, all of the significant inadequacies in documentation or collateral, and

(e) It failed to identify and disclose the need for establishing policies for extending credit and reviewing credit adequacy by the installment loan department, and

(f) It failed to identify and disclose the need for establishing policies for, and review of criteria for, doing business with merchants of consumer products, and

(g) It failed to identify and disclose the need for reviewing and evaluating the credit experience of consumer product merchants to whom bank was extending consumer credit, and

(h) It failed to identify and disclose the need for the board of directors, independently of bank management, to monitor reports of past due loans and

(i) It failed to identify and disclose the need for the board of directors, independently of bank management, to monitor overdraft reports, and

(j) It failed to identify and disclose the need for committee review and approval, independently of the initiating loan officer, of proposed letters of credit prior to their issuance.

(k) It failed to identify and disclose the need for committee review and approval, independently of the initiating loan officer, of commercial loans prior to their commitment, funding or disbursement.

(l) It failed to identify and disclose in a timely fashion the need for committee review and approval, independently of the initiating loan officer, of real estate loans prior to their commitment, funding, or disbursement.

"30. PMM breached its contract with Bank by its continuous failure to perform overall review and evaluation of the control aspects of Bank's operating and auditing procedures and assess the functioning of the Bank's systems of internal control in a manner commensurate with the level of skill, competence, expert knowledge and diligence which it had contracted to possess and exercise, or even which normally would be possessed and exercised by Certified Public Accountants in the performance of bank auditing and management consulting services in that:

(a) It failed to identify and disclose the need to require separate individuals or committees independently to perform the incompatible functions of loan initiation, credit review and approval, and loan funding or disbursement, and

(b) It failed to identify and disclose the need for identification of 'outside' business transactions of bank officers with lending authority in order to avoid disastrous conflicts of interest, and

(c) It failed to identify and disclose the need for an adequately staffed loan review department which would function independently of both the loan initiation function and the credit review and approval function, to monitor extensions of credit, renewals and other credit disbursements.

"31. PMM breached its contract with Bank by its continuous failure to ascertain the reliability of the reviews and reports of the credit department in a manner commensurate with the level of skill, competence, expert knowledge and diligence which it had contracted to possess and exercise, or even which normally would be possessed and exercised by Certified Public Accountants in the performance of bank auditing and management consulting services in that:

(a) It failed to identify and disclose the need for separating the function of the credit department from those of the initiating loan officer regarding the submission of adequate credit information by the credit department independently of the initiating loan officer, and

(b) It failed to identify and disclose the need for adequate staffing of the credit department by experienced credit personnel.

"32. PMM breached its contract with Bank by its failure to perform an evaluation of the overall quality of Bank's loan portfolio and the adequacy of the related reserve for loan losses at the end of calendar year 1973 in a manner commensurate with the level of skill, competence, expert knowledge and diligence which it had contracted to possess and exercise, or even which normally would be possessed and exercised by Certified Public Accountants in the performance of bank auditing and management consulting services in that:

(a) The personnel assigned to perform such evaluation did not have significant exposure to bank auditing, controls, and sound banking practices prior to being assigned to do such work and therefore were not competent to perform the tasks assigned to them, and

(b) Such persons were not adequately supervised, and

(c) It failed adequately and thoroughly to review the work papers and reports of the persons conducting the audit, and

(d) It failed to aggregate credit to related borrowers in order to identify and disclose excessive concentrations of credit, and

(e) It failed to review the composition of the loan portfolio in an adequate fashion to determine inadequacies in documentation or collateral.

"33. PMM breached its contract with Bank by its continuous failure to ascertain that appropriate action was taken upon audit findings in a manner commensurate with the level of skill, competence, expert knowledge and diligence which it had contracted to possess and exercise, or even which normally would be possessed and exercised by Certified Public Accountants in the performance of bank auditing and management consulting services in that, to the extent it did identify any potential problem areas, it failed to ascertain that any of the same were called to the attention of Bank's board of directors despite notice to PMM that the directors did not have knowledge of any such potential problems."

By the time the hearing on PMM's motion for summary judgment was held, the motion had been amended to specifically controvert UP's claims for recovery of its loan losses. In addition, hundreds of pages of depositions had been taken, including depositions of at least two of UP's employees who had been principal officers of UP at the time the contract was entered into and the alleged losses occurred, a partner of PMM and others. Numerous affidavits were filed by both sides.

■ In ruling on motions for summary judgment, both the trial court and this Court must consider the matter in the same manner as a motion for directed verdict made at the close of plaintiff's proof; i.e., all affidavits and depositions must be viewed in the light most favorable to the opponent of the motion and all legitimate conclusions of fact therefrom must be drawn in their favor. If after so doing a disputed issue of material fact is found to exist, the motion must be denied. *Stone v. Hinds*, 541 S.W.2d 598 (Tenn.App.1976).

■ The parties have filed a rather extensive appendix as part of their appeal. We have reviewed the record and are of the opinion that there are numerous disputed issues of material facts. We are, therefore, of the opinion that this is not a case for summary judgment but one which should be tried upon the merits.

The Court also has some concern about the breadth of the ruling by the trial court on the motion for summary judgment. As a result of a motion to reconsider filed by UP following the Court's grant of summary judgment, in essence there were two hearings—one on May 23, 1985 and another on May 28, 1985. The first, on May 23rd, was the original hearing on the motion concerning the loan loss claims of UP. Specifically, PMM directed its motion for summary judgment to the claims of UP which are encompassed in paragraphs 29, 30 and 31 of its amended complaint, all three of which are set forth above.

In argument before the trial court on May 23rd, counsel for PMM conceded that there were issues of material fact. We quote:

Now, with respect to other parts of the complaint, we're not arguing that there is no dispute. Other causes of the loan losses, the allegation of incompetent personnel, [in paragraph 28 of UP's complaint] we're not saying there's not a dispute about that. We dispute it, and they say we were incompetent.

. . . .

The 1973 loan loss reserve, which is paragraph 32, of the complaint, there is a dispute over whether that contributed to the loan losses.

The management letters to the board, which is paragraph 33, there is arguably a dispute, although not terribly genuine, and we're not addressing that today with respect to its potential cause of loan losses.

Finally, at the end, we've got the latest claim by the bank that's not in the complaint but has been filed in some supplemental pleadings, of which your Honor is well aware, which we call the ILCO problem.

Those are the breaches that this bank says caused its loan losses.

. . . .

The point of this is, we clearly cannot say that there aren't issue that the bank has raised which are disputed, which contributed, allegedly by the bank, disputed by us, to some of these loan losses. No question about that.

What has been identified as the "ILCO claim" merits some explanation. It seems that during an audit of another client in 1974, while UP was also a client, employees of PMM discovered specific evidence of what clearly appeared to be not only a conflict of interest but in all probability a violation of federal banking laws by one or more loan officers of UP. The other client in question was International Land Company, or "ILCO".

ILCO was a heavy borrower of UP. The loan officer who handled some of the extensions of credit to ILCO for UP served on the board of directors of ILCO. He had also been given a lot in a real estate development of ILCO.

It is UP's contention that although this information came into the hands of PMM in 1974, it was not until UP was given access to certain files of PMM in September, 1984 that it became aware of the fact that PMM had knowledge of such incriminating information concerning some of its officers. It became UP's contention that had this information been timely brought to the attention of its officers, board of directors and stockholders, steps could have been taken to prevent these officers from loaning mil-

lions of dollars and thus, PMM's failure to do so constituted a breach of its contract.

As part of UP's motion to reconsider the order of summary judgment of the trial court, it also sought leave to amend its complaint to assert an additional claim based upon an elaboration of the above allegations concerning ILCO. While the amendment was not granted inasmuch as the trial court overruled UP's motion to reconsider, counsel for PMM in argument before the trial judge conceded that the complaint as then drawn was broad enough in its language to include the ILCO claim.

In its complaint, UP set forth the nature of the services which it contended PMM agreed to provide. In its answer, PMM admitted submitting a detailed written proposal but denied any verbal commitments. Comparative analysis of PMM's written proposal with UP's contention of the verbal promises reveals that they are virtually identical, except for the standard of performance. UP contended that PMM verbally agreed to exercise the highest degree of care. In denying this, PMM contended that "our examination will be made in accordance with generally accepted auditing standards." Nonetheless, PMM emphasized in its written proposal high quality performance based upon specialization within its accounting firm.

In addition, it was disputed by the parties what the terms of the contract meant and what services they involved. PMM's proposal utilizes such terms as "auditing", "management consulting services" and "internal control". The record contains conflicting affidavits as to what a client should expect and what an auditing firm should provide as part of those services. A conclusory analysis shows that PMM contends that Harrison and Merkle, officers of UP, admitted that unsound lending policies and procedures approved by them caused the loan losses. On the other hand, UP contends that these unsound lending policies were brought about by PMM's breach of contract in that it failed to perform many of the functions that it committed itself to when it came on board as UP's independent auditor. There is clearly a dispute as to what or who caused the unsound lending policies.

In addition, although somewhat of a technicality, there is a distinct flaw in PMM's motion for summary judgment. In essence, it reads like a motion for a directed verdict. However, in neither the motion nor the trial judge's order was there stated a contention or a finding of an absence of a genuine issue of material fact. All three sections of this Court have held that it is essential to the consideration of a motion for summary judgment that the motion recite that there is no genuine issue of fact. *See Belsky v. Payne,* 560 S.W.2d 78, 81 (Tenn.App.1977); *Read v. Thomas,* 679 S.W.2d 467, 469 (Tenn.App.1984); and *Keystone Insurance Company v. Griffith,* 659 S.W.2d 364, 366 (Tenn.App.1983). All three cases derive their authority from language in *Teeters v. Currey,* 518 S.W.2d 512 (Tenn. 1974). *Teeters* reversed summary judgment in favor of defendant by the trial court in a medical malpractice case involving the question of the application of the statute of limitations. The Supreme Court said:

At no place in the brief, or in the motion is it suggested there was no genuine issue of fact.

The order of the Court simply recites: The Court being of the opinion that said motion is well taken, the Court does hereby enter judgments in favor of the defendant.

*Id.* at 514.

A major contention of PMM was that the disposition of this case should be controlled by the case of *Delmar Vineyard v. Timmons,* 486 S.W.2d 914 (Tenn.App.1972). We do not reach that issue because we find there are disputed issues of material fact. While it is apparent that the trial judge was materially influenced by *Delmar Vineyard,* both he and counsel for PMM exhibited some uncertainty. At the hearing on UP's motion to reconsider, counsel for PMM stated:

I believe your Honor should deny the motion for re-argument.... The fact is this case is over, if your Honor denies their motion for reargument except for

the appeal. And I tell you, your Honor, the only way that makes any sense to have a three-month trial in this case with respect to anything, is to have the Court of Appeals or the Tennessee Supreme Court tell us all down here that *Delmar Vineyards v. Timmonds* [sic] is or is not the law of the State of Tennessee.

At the conclusion of the hearing the court responded in part as follows:

And the Court has a serious question. Can the bank under these facts, and based on the Delmar decision, recover from PMM, even if what is said about Peat-Marwick is true, based on the fact that there were all of these other contributing factors.

I think the Court of Appeals should tell us whether or not, even under these circumstances, that there would be a claim against the accountants, although there are all of these other, contributing factors, and if they say yes, then we'll try it.

If they say no, that *Delmar* controls, then I guess that would put it to rest.

It has been repeatedly held that the courts of this state do not give advisory opinions. *See De Saussure v. Hall*, 201 Tenn. 164, 297 S.W.2d 90 (1956); *Banks v. Jenkins*, 224 Tenn. 23, 449 S.W.2d 712 (1969).

## I. THE APPEAL OF PMM

■ PMM has appealed from the action of the trial court in dismissing its indemnity claim against UP and its former officers, Harrison and Merkle, for litigation expenses, including attorney's fees. PMM contends that it has been forced to defend itself in litigation as a result of faulty judgment and mistakes on the part of UP officers Harrison and Merkle, and inasmuch as UP had agreed to indemnify Harrison and Merkle, it should pay for the cost of defending the litigation incurred by PMM.

As stated in its brief, PMM relies heavily upon *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336 (Tenn.1985), for the proposition that a defendant may seek indemnification for its litigation expenses, including attorneys' fees, from a third party even though the defendant has not been required to pay any damages in the main action. By holding that attorneys' fees and litigation expenses could be recovered in this situation, the Court in *Pullman* stated:

[W]e recognize an exception to that rule and hold that the right of indemnity which arises by operation of law, based upon the relationship of the parties, see *Cohen v. Noel*, 165 Tenn. [1 Beel.] 600, 56 S.W.2d 744 (1933) includes the right to recover attorneys' fees and other litigation costs which have been incurred by the indemnitee in litigation with a third party.

*Id.* at 338.

PMM claims that this exception should be applied by this Court to the case under consideration.

It should be noted that PMM's claim for indemnity is based upon an active/passive negligence theory. The decision in *Pullman* was based upon the "relationship of the parties" theory. However, we do not reach the issue of whether or not the exception carved out in *Pullman* would apply to the active/passive negligence theory, for in our opinion, PMM cannot support a claim for indemnity under this latter theory. In *Cohen v. Noel*, 165 Tenn. 600, 56 S.W.2d 744 (1933), our Supreme Court recognized the substantive right of indemnification between joint tort-feasors, in a case where a passive tort-feasor sought indemnification from an active tort-feasor. It has likewise been held that indemnity in a case such as this will be allowed only when both the active and passive tort-feasors "share a common liability in tort to the injured party." *See Dawn v. Essex Conveyors, Inc.*, 498 F.2d 921, 924 (6th Cir.1974).

Under the facts of this case, however, we see no way in holding that Harrison and Merkle on the one hand and PMM on the other could be considered joint tort-feasors for the reason that PMM could not maintain a suit for negligence against Harrison and Merkle in the performance of their duties as bank officers. 9 C.J.S. *Banks and Banking* § 124 (1938) states:

The bank itself is a proper person to bring an action against its officers or directors for damages resulting from their negligence or wrongful acts, and where the loss falls on the bank, the bank itself or its legal representative *alone* may sue to recover therefor. [emphasis added]

*See also Merriman v. Smith,* 599 S.W.2d 548 (Tenn.App.1979). The appeal of PMM as to this issue is without merit.

Accordingly, the judgment of the trial court as to the indemnity claim of PMM is affirmed. The judgment of the trial court granting summary judgment as to the loan claims of UP is reversed. This cause is remanded to the Circuit Court of Shelby County for a trial on the merits. Costs in this cause are taxed to PMM, for which execution may issue, if necessary.

CRAWFORD, J., and NEARN, Special J., concur.