No. 34,795

The Board of County Commissioners of the County of Allen, *Appellant,* v. N. A. Baker and M. M. Miller, *Appellees.*

(102 P. 2d 1006)

Opinion filed June 8, 1940.

*Mitchell H. Bushey, J. C. Edwards,* both of Iola, and *Donald G. Sands,* of Topeka, for the appellant.

*W. C. Ralston,* of Topeka, for the appellees.

The opinion of the court was delivered by

Hoch, J.: This was an action to recover damages for breach of contract. The trial court made certain findings favorable to the plaintiff, but awarded only nominal damages, holding that no actual damage had been shown. Plaintiff appeals, contending that additional findings of fact should have been made and that the judgment for nominal damages only was inconsistent with findings of fact and conclusions of law theretofore made.

The appellant, the Board of County Commissioners of Allen County, entered into a contract on August 8, 1936, with appellees, Baker & Miller, licensed municipal accountants, for an audit of the accounts and records of the various county offices. The audit was to be made in compliance with the statutory requirement of an annual county audit. (G. S. 1935, 75-1122.) The appellees agreed to make the audit in accordance with the "minimum standard audit program" approved by the State Municipal Accounting Board as required by the statute. The cost of the audit was not to exceed $850.

The appellees proceeded to make the audit. The audit of the county treasurer's office covered the period from October 8, 1935, to October 12, 1936, and that of the other county offices from January 1, 1936, to January 11, 1937. The appellees were paid the full amount of $850 in three payments, the last one of which was made on March 1, 1937. Certain inaccuracies and irregularities were discovered in the report of the auditors, further audit being made of three county offices. Following these disclosures, this action was brought.

After preliminary recitals, it was alleged in the petition that the defendants failed to discover or report shortages later found to have then existed in the "emergency fund" maintained in the office of the county engineer; that as a result of carelessness, negligence and wantonness in making the audit, the defendants had erroneously reported that the county treasurer had collected about fifteen thousand dollars in taxes in excess of what should have been collected, and that the county clerk had about five hundred dollars in cash on hand, whereas nearly all of the amount reported as cash consisted of checks. Other allegations not material to the present dis-

cussion need not be narrated, except to add that the plaintiffs alleged that by reason of the careless, negligent and wanton manner in which the audit had been made and of the incorrect audit report, the audit was "worthless to and of no value" to the county, and that plaintiffs had been damaged in the amount paid for the audit, for which amount judgment was asked.

Defendant Miller was not served with summons, being out of the jurisdiction of the state. The answer of defendant Baker admitted the execution of the written contract and the making of the audit. It alleged that the "emergency fund" in the office of the county engineer was created without authority of law and that the defendants were under no obligation to examine or audit it, but that in their report they did call attention to the fact that such fund was in existence, and alleged that the reimbursement vouchers of this fund were sworn to by the county engineer and approved by the county attorney; that the audit was made in good faith and,

"That the purpose of said contract and audit report was to enable plaintiff to comply with the provisions of the General Statutes of Kansas of 1935, which require the governing body of each county in the state of Kansas to have the accounts of such county examined and audited by a licensed municipal accountant or accountants, or certified public accountant or accountants; that said audit report was filed with the county clerk of Allen county, Kansas, and in the state accountant's office, Capitol Building, Topeka, Kansas, as alleged in said third amended petition, and thereby said contract and said audit report completely and fully fulfilled the purpose for which they were intended, as provided by the 1935 General Statutes of the state of Kansas pertaining thereto; that plaintiff has received and retained all the benefits of said contract and audit report and plaintiff therefore has no cause of action for damages against this defendant for breach of said audit contract."

The case was heard by the court, after which sixteen findings of fact and certain conclusions of law were made. It will be sufficient for this review to refer to the findings of fact only to the extent necessary in connection with the "conclusions of law." The conclusions of law were as follows:

"I

"That in making the audit in question the defendants were guilty of negligence in the preparation of their report,

(a) "In not reconciling, within a reasonable degree of accuracy in the first instance, the total taxes collected and uncollected, charged to the treasurer, with the abstract of taxes furnished by the county clerk;

(b) "In not setting out the items of cash on hand in the county clerk's office, as required by the minimum standard audit program;

(c) "In wholly failing to check the A. W. Young emergency fund and include same in their audit.

"II

"That Allen county, Kansas, had the benefit of the audit of the offices concerning which no question has been raised; that said audit is not entirely worthless, but was of some value to said county.

"III

"That plaintiff has failed to prove any substantial damage that it has suffered by reason of the negligence of the defendants; but that because of the negligence of defendants the plaintiff is entitled to recover nominal damages of one dollar.

"IV

"That plaintiff is entitled to recover its costs herein."

This opinion will be simplified if we state at the outset the principal conclusions to which we have arrived after examination of the record, and particularly after analysis of the findings of the trial court. Those conclusions are that the trial court failed, in its final determination, to evaluate one of the primary purposes for which the audit was made; that it proceeded upon the erroneous theory that unless the plaintiff established a money loss, apart from the payments made to the defendants, it had shown no substantial damage. The purpose of a county audit is not merely to "comply with the statute" as the defendants rather indicate in their answer. Its primary purpose—the purpose of the statute itself—is to determine whether the accounts and records of the county are being accurately and honestly kept. When the county commissioners, who are charged with responsibility in the matter, employ accountants to make the audit, they contract for skill, accuracy and fidelity on the part of those who represent themselves as experts in this line of work. If service which measures up to that high standard is not furnished, the breach of the contract is fundamental—it goes to the very heart of the contract. If gross inaccuracies are discovered in the report; if disclosure is made that the accountants have failed to report material facts of serious import, bearing upon questions of efficiency and honesty, the report becomes of little, if any, value. If those employing the accountants cannot rely upon an assumption that the audit and the report have been made with reasonable accuracy and with complete fidelity they have failed to receive the principal thing they were to get under the contract. When confidence in the report is gone, very little is left. In the light of these elementary and fundamental propositions, let us examine the record.

We first note the court's findings (a) (b) (c) under its "conclu-

sions of law." Finding (*a*) was that the defendants were "guilty of negligence in not reconciling, within a reasonable degree of accuracy in the first instance, the total taxes collected and uncollected, charged to the treasurer, with the abstract of taxes furnished by the county clerk." This conclusion was based upon the court's findings of fact numbered ten and twelve, which we need only summarize. The court there found that the defendants erroneously reported that the county treasurer's books showed the tax roll to be in excess of the tax abstract in the sum of $14,995.30; that subsequently Mr. Bartlett, a bookkeeper in the county clerk's office, examined the county treasurer's records and discovered that the correct amount of the difference between the tax roll and the tax abstract was only $44.62; that the attention of the defendants was called to the finding by Mr. Bartlett, after which they wrote to the county clerk and submitted pages to be substituted in their report, showing the difference to be $44.62 as found by Mr. Bartlett, and on this matter the court found that "the evidence does not disclose that the defendants ever checked their records to determine their accuracy."

The court's finding (*b*) was that the defendants were "guilty of negligence in not setting out the items of cash on hand in the county clerk's office, as required by the minimum standard audit program." This is based upon the court's finding of fact number fourteen, the substance of which is that the auditors reported the "cash count, January 11, 1937 (noon)," to be $494.38, whereas the defendant's work sheets which were placed into the record as an exhibit by the plaintiff, showed the following:

"Cash on hand, January 11, 1937 (noon):

| | |
|---|---:|
| Coin | $7.75 |
| Bills | 12.00 |
| Checks | 416.88 |
| Cash items (express) | 2.00 |
| I. O. U. (Elarton) | 55.75 |
| | $494.38" |

The item of $416.88, on the same page of their work sheets, is made up as follows:

| | |
|---|---:|
| "A. W. Young Emergency Fund No. 517, 1-11-37 | $0.25 |
| Elarton, Ralph, 1-2-37 | 391.63 |
| Palace Ready to Wear, 9-4-36 | 25.00 |
| | $416.88" |

In this connection we note the testimony of W. L. Warnica. Mr. Warnica was employed by the defendants to help make the audit. He identified an exhibit by the plaintiff as sheets made in his handwriting, signed and turned over by him to his employer, Miller. One of these sheets reads as follows:

"Allen county, county clerk. County clerk claims the 47 cigarette licenses issued and covered by his personal check on January 2, 1937, have now been collected on except for ten for which he secured a bank loan. The balance of the check *represents funds diverted to his own use*. The balance of $109.63 is supposed to be covered by another check."

It is also pertinent to note the following testimony of Barton Avery:

"I am now and was in September, 1937, a senior accountant in the state accountant's office. I made an investigation of the accounts of Ralph Elarton, county clerk, from the period January 3, 1936, to January 8, 1937, which showed a difference of $381.95, which had not been reported. I also made a check on the discrepancy as to the cash on hand in the county clerk's office between the Cornell audit and the Baker-Miller audit. We asked Mr. Miller about the difference and he said that he omitted the $258; that Mr. Elarton stated that it was for an item to be remitted direct to the Department of Inspection and Registration. Mr. Austin Logan was in Iola with me also, and we made a check to see if the personal check of $394 of Ralph Elarton, which was in the cash drawer, was ever cashed and cleared the bank, and we learned that Mr. Elarton did not even maintain a bank account at that time."

While the trial court made no specific findings relative to the testimony of witnesses Warnica and Avery, their testimony was not disputed.

It thus appears that the item reported as "cash, $494.38," in the county clerk's office, was not cash. Most of it consisted of checks, and the principal check was the personal check of the county clerk, Elarton, whose resignation subsequently followed after disclosures of irregularities. It is hardly necessary to say that of course the county commissioners were entitled to know that checks were being carried as cash. A pertinent provision of the minimum standard audit program, which appellees contracted to observe, reads as follows:

"Count all cash and cash items on hand. List checks and note date of making. Note checks signed by officers, deputies or employees. Insist upon all checks being deposited in the bank not later than the next business day and see that there is no offsetting withdrawal. Request depository to make direct report of any such items not cleared for any reason." (Audit Procedure, 1-12 (a).)

But no recourse to the audit program is required. Had it contained no such specific provision it would none the less have been the plain duty of appellees to report the facts. The county commissioners were certainly entitled to know that a county officer was substituting his own check for cash in the cash drawer. What confidence in the report could remain after disclosure of such a serious failure to do their work carefully and faithfully?

We next note the trial court's "conclusion of law" (c), which was that "the defendants were guilty of negligence in wholly failing to check the A. W. Young emergency fund and include same in their audit." This is based upon the evidence covered by the court's findings of fact numbered fifteen and sixteen. The substance of those findings is that no audit was made of the "emergency fund" in the county engineer's office, the defendants doing little more than report the existence of the fund; but that the work sheets, submitted as an exhibit by the plaintiff, showed "no funds on hand January 11, 1937. An emergency account has been set up under the name of A. W. Young emergency fund. The amount, $389.49"; that as a result of an audit subsequently made of this emergency fund by an accountant from the state accountant's office, and covering the same period, unexplained expenditures were disclosed in the amount of $196.77. In other words, it is the plain implication of the court's findings, that if the appellees had not been guilty of negligence in failing to audit this fund they would have discovered a shortage of about two hundred dollars.

The appellees made no objection at the time, and make none now, to any of the findings heretofore narrated.

We now come to the court's "conclusion of law" number two, to which the appellant objected at the time and now objects, which reads as follows:

"Allen county, Kansas, had the benefit of the audit of the offices concerning which no question has been raised; that said audit is not entirely worthless, but was of some value to said county."

The theory of the trial court seems to have been that since the audit as to the other county offices had not been attacked, the disclosure and proof of inaccuracies and irregularities in the report as to only three county offices do not seriously injure the value of the report. The unsoundness of such a theory is sufficiently indicated, we think, by the general comments made at the start of this opinion. When reliance can no longer be placed in an auditor's report, the

coin of the audit's value has become counterfeit. Moreover, it is pertinent to note that the contract was for a *county* audit, and this was in harmony with the emphasis placed upon the proposition in the audit program, that county audits are based upon the county *as a unit*. The "introductory comment" therein reads as follows:

"The audit contemplated herein comprehends the financial position and financial management of the county. The financial position and management of a county is based on the county as a unit. It may seem trite to indicate as a basic principle that an audit program must consider the county as a composite unit made up of various offices."

The only way the county commissioners could have discovered inaccuracies and irregularities, if any existed, in the other county offices, would have been to have other auditors make another audit. Faults of the audit made by defendants were not discovered until September, 1937. Another year, subsequent to the period covered by appellee's audit, had almost expired. In view of the fact that the statute requires that a county audit be made annually, the time for another regular audit would soon arrive. In the meantime, the county commissioners had secured the services of an accountant from the state accountant's office. Under such circumstances, it would be unreasonable to say that the appellant was under obligation, immediately upon the disclosures in September, 1937, to have another audit made of all county offices for 1936, and having failed to do so it cannot recover.

The only remaining question is whether the amount paid for the audit is a proper measure of damages. What other measure could be used? On what scales may some hypothetical residue of reliance be weighed when confidence in an auditor's report has been largely destroyed? We do not say that minor inaccuracies in an audit and slight errors in an auditor's report may not be overlooked, nor that under some circumstances substantial value from an audit may not remain in spite of its errors. But in view of the negligence, the inaccuracies, the inexcusable failure to report facts of serious character, found by the trial court in the instant case, on a record which amply supports such findings, we must conclude that the appellees failed, in a fundamental and essential particular, to furnish the expert and faithful service which they contracted to furnish. Whether this was due to personal fault of the appellees themselves or to that of employees working for them is not material. As in other like situations, public accountants are liable for the failure of their sub-

ordinates to make a proper audit. (*Ultramares Corp. v. Touche*, 255 N. Y. 170, 174 N. E. 441, 74 A. L. R. 1139.)

The general rule is that the measure of damages for defective performance of a contract is the difference in the value between what is tendered as performance and what is due as performance under the contract; and that if what is tendered is unsuitable for the purpose contemplated, the measure of damages may be the amount required to remedy the defect. (17 C. J. 853; 1 Sutherland, Damages, 4th ed., p. 48.) In the instant case what was called for as performance was an audit and report in which reliance could be placed. What was furnished was an audit and report in which reliance could not be placed. In the case of *City of East Grand Forks v. Steele*, 121 Minn. 296, 141 N. W. 181, which involved a faulty audit and report by public accountants, it was said:

"5. Defendants represented themselves as expert accountants, which implied that they were skilled in that class of work. In accepting employment as expert accountants, they undertook, and the plaintiff had the right to expect, that in the performance of their duties they would exercise the average ability and skill of those engaged in that branch of skilled labor. They were employed to ascertain, among other things, whether any irregularities had occurred in the financial transactions of the city clerk, and, if so, the nature and extent of such irregularities. If, from want of proper skill, or from negligence, they did not disclose the true situation, they failed to perform the duty which they had assumed, and failed to earn the compensation which plaintiff had agreed to pay them for the proper performance of such duty.

"6. The work of an expert accountant is of such technical character and requires such peculiar skill that the ordinary person cannot be expected to know whether he performs his duties properly or otherwise, but must rely upon his report as to the thoroughness and accuracy of his work. The full contract price having been paid in the belief, induced by defendants' report, that such report disclosed fully and accurately the condition of the city's accounts, the city is entitled to recover back the amounts so paid, upon proving that, through the incompetence or the negligence of defendants, the report was in substance misleading and false." (p. 300.)

In substantial particulars, both in what the appellees reported and in what they failed to report, the instant audit and report were "misleading and false," and the plaintiff is entitled to recover the amount paid under the contract.

The judgment for nominal damages only is set aside, and the case remanded with direction to render judgment for the plaintiff in the sum of $850, together with interest from the dates the installment payments were made.