536 So.2d 278 (1988)
COOPERS & LYBRAND, Appellant,
v.
TRUSTEES OF the ARCHDIOCESE OF MIAMI/DIOCESE OF ST. PETERSBURG HEALTH & WELFARE PLAN, Appellee.
Nos. 87-23, 87-903.
District Court of Appeal of Florida, Third District.
December 6, 1988.
Rehearing Denied January 23, 1989.
*279 Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., and Bradford Swing, Miami, for appellant.
Wood, Lucksinger & Epstein and J. Michael Fitzgerald, Joseph J. Portuondo, and Juan Carlos Enjamio, Miami, for appellee.
Before SCHWARTZ, C.J., and NESBITT and JORGENSON, JJ.
JORGENSON, Judge.
Coopers & Lybrand appeals from a final judgment entered against it in favor of the Trustees of the Archdiocese of Miami. The judgment was based upon a jury's finding of negligence by the accounting firm in its audits of the Trustees' financial records. For the reasons which follow, we reverse in part, affirm in part, and remand for further proceedings.

The Health Plan
In 1968 the Archdiocese of Miami established a health and welfare plan to provide coverage for medical expenses of the priests, brothers, sisters, and lay employees of the Archdiocese of Miami and the Diocese of St. Petersburg. A board of trustees was created to oversee the plan; Dennis McGee was hired to administer the plan. Each year McGee and the Trustees set the level of contributions required based on medical expenses actually paid that year, fees paid to McGee, and the amount necessary to establish and maintain a reserve fund equal to approximately two-thirds of the medical expenses paid. The reserve fund was created to cover any fees or expenses which exceeded parish contributions in any given year.
Each month McGee tallied contributions to and payments from the fund to determine whether the plan had a surplus or a deficit that month. Each quarter the Trustees reviewed McGee's reports for trends that would require increases in the parishes' contributions for the remainder of the year. At the end of each year, all twelve months of operating information was gathered, and the Trustees set the level of contributions for the following year.

Lloyd's Stop-Loss Policy
In 1969, the Trustees purchased from Lloyd's of London a "stop-loss" policy which would insure against the risk that in any single year the aggregate of claims would be far in excess of normal. The policy was designed to cover any catastrophic losses that could deplete the reserve fund, such as extraordinary expenses due to an epidemic of a serious illness.
The stop-loss policy was custom-designed. Before issuing the policy, Lloyd's required the Trustees to submit detailed information about the types and amounts of benefits to be provided in the plan year, the number of employees covered, the rate of parish contributions during the year, and McGee's fees. The information was expressly included in the policy, and no insurance would issue until all the information was provided and expressly warranted as true by the Trustees.
In 1970, benefits paid to the plan's beneficiaries exceeded the level of parish contributions. Lloyd's thus had to pay the Trustees $186,000 under the terms of the stop-loss policy even though no disaster had occurred. Lloyd's had simply underestimated the level of contributions the plan needed to take in to meet anticipated billings. Lloyd's thereafter took greater care to examine any expansion in benefits and increases in medical costs to avoid incurring *280 further losses under the Trustees' policy.

McGee's Defalcations; Increased Plan Benefits
From the inception of the stop-loss plan in 1969 until 1976, McGee collected premiums from the Trustees and forwarded them to Lloyd's broker. Each year McGee held the premiums longer before forwarding them. By the end of 1976, he was delinquent in forwarding over $40,000 in premiums.
In 1977, Lloyd's renewed the policy for the 1977-1978 plan year after reviewing the past year's claims and setting a contribution level. However, McGee did not pay the premium on this policy; by January of 1978 he was approximately $120,000 in arrears. Lloyd's broker began to pursue McGee for payment of these premiums and did not renew the policy. By May 1979, $13,000 of the past due balance remained unpaid; no information about the 1979-80 term had been submitted to Lloyd's. Stop-loss coverage ceased in 1980.
While Lloyd's pursued McGee for payment of past due premiums and cancelled the plan's stop-loss policy, the Trustees, unaware of the impending loss of the coverage, significantly increased benefits to its plan members. Lloyd's was unaware of any changes in benefits offered. In the 1979-80 plan year, payments to members exceeded contributions by $318,350.37. Lloyd's had not issued a stop-loss policy for that period, because McGee had defaulted on payments of premiums.

Coopers & Lybrand's Negligent Audit
Coopers conducted a "cash basis" audit of the Trustees' health plan every fiscal year between 1969 and 1981 and prepared work papers reflecting its audit program. The papers depicted step-by-step procedures for the auditors to follow. One such procedure explicitly required the auditors to obtain a copy of the current stop-loss policy and record any changes. After 1971, Coopers neither obtained a copy of the policy nor verified the existence of insurance. Nevertheless, Coopers repeatedly represented to the Trustees that Lloyd's stop-loss policy remained in effect, even after Lloyd's refused to renew the policy when McGee retained the premiums. An accounting expert testified that Coopers' continuing misrepresentations violated generally accepted auditing standards.[1]
At least two of the Trustees knew, but did not tell Coopers, that McGee had previously failed to pay premiums to an insurer in another business deal with one of the Trustees.

The Litigation
The Trustees learned in 1981 that McGee had not forwarded the premiums to Lloyd's and that Lloyd's had cancelled the stop-loss policy in 1980. The broker never notified the Trustees of the loss of coverage because McGee had consistently blamed the Trustees for the delays and non-payments. McGee had also warned the broker not to contact the Trustees. The Trustees sued Lloyd's, the underwriters at Lloyd's, McGee, and McGee's insurance company on various counts, including breach of contract, conversion, and negligence. In 1983 the Trustees filed a separate action against Coopers & Lybrand for accounting malpractice. The two actions were consolidated in 1984.[2] After a five-day trial in 1986, the jury found Coopers negligent and apportioned liability between Coopers (60%) and the Trustees (40%).
The trial court submitted to the jury two distinct classes of possible economic damages. One class consists of the "losses" suffered by the Trustees' health plan between 1979 and 1980 when the Trustees had to withdraw funds from their reserve. The balance of the damages awarded consists *281 of premiums which the Trustees paid to McGee during the period when he failed to forward them to Lloyd's, but the Trustees' plan fortuitously suffered no "losses," i.e., payments did not exceed contributions.[3]
Coopers contends on appeal that its failure to discover McGee's defalcations and the resultant loss of stop-loss coverage was not the proximate cause of the Trustees' losses. The Trustees, in turn, cross-appeal from that portion of the jury verdict which held them 40% responsible for their losses; they also appeal from the trial court's refusal to instruct the jury to consider losses for the 1978-79 fiscal year and from the trial court's directed verdict denying their claim for punitive damages. We find the arguments raised in the Trustees' cross-appeal to be without merit,[4] affirm the trial court's rulings on those issues, and turn to the dispositive issue on appeal: the measure of damages in an action for accountant malpractice.

The Proper Measure of Damages
This is a case of first impression. There are few reported cases in Florida which address accountant malpractice; none address the measure of damages.[5] Neither the parties' briefs nor this court's research reveals any case in this jurisdiction on point. However, the same analyses of foreseeability and causation undertaken when assessing damages in other professional malpractice actions should apply when calculating the measure of damages in an accountant malpractice action.[6]
For failure to discover defalcations or fraud, liability of an accountant is limited to losses which were the proximate result of the accountant's breach of duty. 1 Am.Jur.2d Accountants § 17 (1962); see generally, Annotation, Accountant's Malpractice Liability to Client, 92 A.L.R.3d 396 (1979). See also In re Bell & Beckwith, 50 B.R. 422 (Bkrtcy.N.D. Ohio 1985) (citations to later proceedings omitted) (accountant held liable to his client for amount of funds which he failed to discover were being diverted from client's business); Richard v. Staehle, 70 Ohio App.2d 93, 434 N.E.2d 1379 (1980) (accountant who negligently advised client on avoiding violations of the federal Fair Labor Standards Act liable to client for amounts client paid to employees pursuant to settlement with Department of Labor for violations of overtime laws); Professional Rodeo Cowboys Ass'n v. Wilch, Smith & Brock, 42 Colo. App. 30, 589 P.2d 510 (1978) (accounting firm liable to cowboy association for costs and fees *282 incurred in association's settlement of cowboys' underlying dispute caused by accountants' negligent tally of winnings to determine "World Champion All-Around Cowboy").

The Deficit
Applying the traditional foreseeability and causation analyses, we reverse that portion of the trial court's judgment which awarded as damages the "deficit" suffered by the self-insurance plan between 1979 and 1980. The causal connection between the deficit and Coopers' negligence is too tenuous to support an award of damages. Although the deficit is a sum certain consisting of the difference between contributions to the fund and claims paid from the fund between 1980 and 1981, the Trustees' assertion that such a loss would have been covered by a policy from Lloyd's is sheer speculation. Testimony elicited at trial shows that there was but a probability that had McGee not diverted the premiums intended for Lloyd's, a stop-loss policy would have been in place and would have covered that loss. As was previously noted, Lloyd's would only renew the policy after it had carefully considered many factors and had arranged for a level of parish contributions that would, in its opinion, cover anticipated benefit payments.
To have prevailed on the claim for coverage, the Trustees must have shown that they could have secured an equivalent policy from Lloyd's or another carrier and that they would have successfully recovered on that policy. See D.R. Mead & Co. v. Cheshire of Florida, Inc., 489 So.2d 830 (Fla. 3d DCA 1986) (to prevail in an action against insurance company for material misrepresentation which precluded recovery on fire policy, insured needed to prove that agent had made misrepresentations and, that if he had not done so, insured would have secured equivalent policy from insurer or another carrier, and would have been successful in action on that policy). The Trustees presented no evidence that Lloyd's, or any other carrier, would have issued a stop-loss policy that would have covered the deficit in the fund. It is also uncertain whether the Trustees and plan participants would have agreed to increased contributions which Lloyd's was likely to demand in light of the expanded benefits offered by the Trustees.
The absence of any evidence that such coverage was even probable goes to the element of causation. Coopers was negligent; the Trustees' plan suffered losses. However, because there is no causal link between Coopers' negligence and the deficit in the plan, the deficit was improperly charged to Coopers. Where policy coverage is merely speculative, as here, we hold that an accounting firm which negligently fails to discover the lack of insurance cannot be charged with benefit payments which might have been covered had the policy been in force.[7]

The Premiums
We agree with the trial court that the premiums paid to McGee for the 1980-81 term which were not forwarded to Lloyd's are losses properly charged to Coopers. We affirm that portion of the judgment. Coopers breached its duty of care and violated generally accepted accounting standards when it failed to discover McGee's retention of the premiums and the resulting absence of stop-loss coverage. The Trustees relied on Coopers' repeated representations that the stop-loss coverage on their health plan remained viable and continued paying McGee premiums on a nonexistent policy. But for Coopers' negligence, the Trustees would have discovered McGee's defalcations and ceased paying premiums to him.
Coopers contends that the Trustees are not entitled to recover the premiums as damages because the Trustees inevitably would have incurred premium expenses even if Coopers had properly performed its *283 audit. We find that argument specious. How the Trustees would have used the funds McGee converted is irrelevant; the only relevant inquiry is whether the loss of those premiums was the proximate and foreseeable result of Coopers' negligence.
Moreover, the Trustees are entitled to recover as damages from Coopers the premiums paid for the 1979-80 term. Coopers failed to discover McGee's retention of the premiums during that period and assured the Trustees that coverage was in place when, in fact, Lloyd's had cancelled the policy. We remand this cause to the trial court to take evidence on the amount paid in premiums for the stop-loss coverage during 1979-80 and to include in its judgment the appropriate rate of prejudgment interest. Any award of damages to the Trustees remains subject to the jury's apportionment of liability which found the Trustees 40% negligent. We also affirm the trial court's award of costs to the Trustees.[8]
Reversed in part, affirmed in part, and remanded with directions.
NOTES
[1] A cash basis audit such as the one Coopers was hired to perform does not generally involve verification of insurance coverage. However, Coopers' audit program explicitly required the auditor to verify the coverage. Coopers does not seek review of the jury's finding of liability.
[2] The actions against Lloyd's and its underwriters were voluntarily dismissed. McGee died before the case came to trial; McGee & Co. filed for bankruptcy in 1984.
[3] The court also awarded the Trustees prejudgment interest and costs of $12,000.
[4] Coopers' 1978-79 audit occurred after the Trustees had paid the premium for that period. Furthermore, Lloyd's did not cancel the policy until 1980 even though McGee had defaulted on premium payments.
[5] See Gordon v. Etue, Wardlaw & Co., 511 So.2d 384 (Fla. 1st DCA 1987) (pattern of racketeering activity not shown by isolated incident of improper audit; no cause of action for breach of due care by accountant to third party even though reliance is known or anticipated); Devco Premium Finance Co. v. North River Ins. Co., 450 So.2d 1216 (Fla. 1st DCA), rev. denied, 458 So.2d 272 (Fla. 1984) (accounting firm charged with negligence can assert defense of comparative negligence by its client); Investors Tax Sheltered Real Estate, Ltd. v. Laventhol, Krekstein, Horwath & Horwath, 370 So.2d 815 (Fla. 3d DCA 1979), cert. denied, 381 So.2d 767 (Fla. 1980) (accountant not liable for negligence in preparation of financial statement to party not in privity); see also Mulligan v. Wallace, 349 So.2d 745 (Fla. 3d DCA), cert. denied, 354 So.2d 983 (Fla. 1977); Dubbin v. Touche Ross & Co., 324 So.2d 128 (Fla. 3d DCA 1975), cert. denied, 336 So.2d 1181 (Fla. 1976); Canaveral Capital Corp. v. Bruce, 214 So.2d 505 (Fla. 3d DCA 1968); Dantzler Lumber & Export Co. v. Columbia Casualty Co., 115 Fla. 541, 156 So. 116 (1934) (cause of action lies for negligent accounting which failed to discover employee's embezzlement).
[6] Accountants, like attorneys, are professionals. See, e.g., Pierce v. AALL Ins. Inc., 531 So.2d 84, 87 (Fla. 1988) (insurance agent, unlike accountant requires no degree in any field and is not a professional; accountant requires baccalaureate degree in accounting plus additional semester hours in that field and, therefore, is a professional for purposes of professional malpractice statute of limitations). See, e.g., for attorney malpractice damages, Kay v. Bricker, 485 So.2d 486 (Fla. 3d DCA 1986); Freeman v. Rubin, 318 So.2d 540 (Fla. 3d DCA 1975) (measure of damages based on attorney's negligence is amount client would have recovered but for attorney's negligence).
[7] Because we reverse that portion of the judgment which awarded the deficit as an element of the Trustees' damages, we do not reach the issue of whether, in an action for professional negligence involving losses under an insurance policy, a party must elect whether to recover premiums paid for the policy or losses suffered which would have been recoverable had a policy been in place.
[8] The Trustees should also be entitled to collect as damages the fees paid to Coopers for the 1979-80 and 1980-81 audits. The Trustees pled generally for compensatory damages which resulted from Coopers' negligence; the audit fees fall within that category. "When reliance can no longer be placed in an auditor's report, the coin of the audit's value has become counterfeit." Board of County Comm'rs of Allen County v. Baker, 152 Kan. 164, 170-71, 102 P.2d 1006, 1010 (1940). On remand, the trial court may consider awarding the audit fees as additional compensatory damages.