746 So.2d 530 (1999)
Ronald L. MONROE, Appellant,
v.
SARASOTA COUNTY SCHOOL BOARD, Appellee.
No. 98-04049.
District Court of Appeal of Florida, Second District.
December 10, 1999.
Michael R. Karp of Karp & Karp, P.A., Sarasota, for Appellant.
Arthur S. Hardy of Matthews, Hutton & Eastmoore, Sarasota, for Appellee.
*531 ALTENBERND, Judge.
Ronald Monroe appeals the dismissal of his complaint against the Sarasota County School Board ("School Board"). The trial court dismissed the lawsuit with prejudice for failure to state a claim for relief. Notwithstanding the supreme court's recent decision in Moransais v. Heathman, 24 Fla. L. Weekly S308, 744 So.2d 973 (Fla. 1999), we affirm the dismissal.
In a nutshell, Mr. Monroe seeks monetary damages from the School Board because, for two months in 1995, the School Board's administrators negligently omitted his name from a list of eligible potential employees. Although the School Board eventually hired Mr. Monroe, he claims that he lost significant salary due to the negligence of the school administrators. We conclude that, even if these school administrators are licensed professionals, no duty exists within the law of negligence requiring them to protect Mr. Monroe from purely economic losses arising from delayed or denied employment with the School Board. Mr. Monroe has no professional/client relationship with these administrators. Moransais merely authorizes a client of a professional corporation to sue a specific professional employee of the corporation for economic damages arising from the employee's breach of his or her professional standard of care.
Despite dicta in Moransais that suggests a cause of action in negligence can be alleged without allegations of bodily injury or property damage,[1] we continue to hold, as a general rule, that bodily injury or property damage is an essential element of a cause of action in negligence. We will expand the common law tort of negligence, waiving that essential element only under extraordinary circumstances which clearly justify judicial interference to protect a plaintiff's economic expectations. This case does not require that a court expand the duties owed in negligence by professional personnel administrators to protect a job applicant's interest in employment with the administrator's employer.

I. THE FACTS AND THE PROCEEDINGS IN THE TRIAL COURT
According to his first amended complaint, Mr. Monroe was previously employed as a teacher by the Sarasota County School Board for a period ending in August 1993. Because of his experience and tenure, he had achieved an employment status described as "step fifteen, masters forty-five" before he left this employment.
On August 11, 1995, Mr. Monroe allegedly had a conversation with an administrator at Laurel Middle School concerning his desire to return to work for the School Board as a teacher of science and language arts. In order to qualify for employment, he completed an employment application and was interviewed by two administrators on August 15. Based on this interview, the School Board classified Mr. Monroe as a "3" based upon a possible range of 1 to 5, and thus "acceptable" for employment. As a result, he was eligible to have his name placed in the "teacher candidate pool."
Mr. Monroe's name should have been included on the list of approved applicants beginning no later than August 26, 1995. Unfortunately, apparently due to an error by one of the administrators, his name was not added to the list. Mr. Monroe did not know his name had been left off the list. In fact, when he received a mailing from the School Board addressed to "Donald Roe" on August 22, he called the personnel office to correct the error in his name and was assured by someone that his name was on the list.
From August 16 to October 12, 1995, Mr. Monroe checked the postings of available School Board jobs on a regular basis *532 and submitted approximately twenty job applications for specific positions. In early September, a new language arts position opened at Riverview High School. Mr. Monroe interviewed for the position. When the administrators at that high school attempted to hire him, they were told initially that his name was not on the hiring list. The School Board then determined that the hiring list for the period between September 11 and September 15 contained an incorrect list of applicants. Apparently, the error omitting Mr. Monroe from the list was corrected by October 10, and he received another offer from Riverview High School. However, he was precluded from accepting this position due to "alleged certification problems."
Ultimately, Mr. Monroe did obtain a job with the School Board a year later and is still employed by the School Board. He was hired in August 1996 with a status of "step six." Mr. Monroe alleges that between August 26 and September 19, 1995, the School Board's contract with the teachers' union would have allowed him to be hired at his former, higher status level. Thus, in his lawsuit, he first claims that, had his name not been omitted from the list between August 26 and September 19, he would have obtained a job in 1995 at a higher salary level. In the alternative, he claims he would have obtained a job in 1995 rather than 1996. He seeks monetary damages to compensate him for these salary losses.
Mr. Monroe's first complaint alleged both negligence and implied contract. The School Board attacked the complaint, arguing that an economic loss doctrine barred the negligence theory and that sovereign immunity barred the implied contract theory. The trial court granted a motion for judgment on the pleadings as to the theory of implied contract, relying on County of Brevard v. Miorelli Engineering, Inc., 703 So.2d 1049 (Fla.1997) (holding that sovereign immunity is not waived for actions based upon implied contract). Mr. Monroe does not challenge that ruling on appeal.
After the trial court granted the School Board's motion for judgment on the pleadings, Mr. Monroe filed his first amended complaint alleging only a negligence theory. He claimed the administrators negligently processed his employment application. The trial court dismissed this amended complaint with prejudice because it contained no allegations of bodily injury or property damage and did not otherwise allege actionable damages. Mr. Monroe appealed that dismissal.

II. MORANSAIS DOES NOT ELIMINATE BODILY INJURY OR PROPERTY DAMAGE AS AN ESSENTIAL ELEMENT WITHIN MOST NEGLIGENCE ACTIONS
Prior to the supreme court's decision in Moransais, there was little question that the negligence count in this complaint failed to state a claim for relief in the Second District because Mr. Monroe had suffered only a loss of salary, unrelated to bodily injury or property damage. See Moransais v. Heathman, 702 So.2d 601 (Fla. 2d DCA 1997); Sandarac Ass'n v. W.R. Frizzell Architects, Inc., 609 So.2d 1349 (Fla. 2d DCA 1992). However, in Moransais v. Heathman, 744 So.2d 973 (Fla.1999), the supreme court authorized a claim for professional malpractice seeking purely economic losses against two engineers with whom the plaintiff did not have a direct contract. The engineers were employees of a company the plaintiff had retained to inspect a home that he planned to purchase. The supreme court permitted the plaintiff to bring this lawsuit, notwithstanding the infamous economic loss doctrine. Apparently, the plaintiff in Moransais chose to file a professional negligence claim against the engineers because his contract claim with the engineers' employer contained a limitation of liability clause that might have restricted his recovery of damages from the company. Thus, he sued the professionals with whom *533 he had no direct contract and to whom he had paid no direct consideration.[2]
The primary question for this appeal is whether Moransais now provides Mr. Monroe with a cause of action in negligence against the School Board. The trial court did not have the benefit of Moransais because the complaint was dismissed prior to the supreme court's decision. Thus, we assume for purposes of this opinion that the administrators who erred in failing to properly process Mr. Monroe's application were professionals because they were licensed teachers whose vocation requires a minimum of a four-year college degree. See Moransais, 744 So.2d at 976. We further assume that the processing of Mr. Monroe's application fell within their duties as school administrators, and that the School Board would be vicariously liable for their negligence under a theory of respondent superior.[3] Nevertheless, we conclude that Mr. Monroe has not alleged a cause of action against the School Board.
We emphasize that this result is not based on any "bar" created by some modern economic loss doctrine that serves as an affirmative defense in negligence cases. See Sandarac Ass'n, 609 So.2d 1349, 1355. Instead, by longstanding precedent, the relationship created when these teachers/administrators assisted Mr. Monroe in the application process does not support the imposition of a general standard of care upon these teachers to protect his economic interests in future potential employment with the School Board. The risk that he might sustain these intangible economic damages is not a type of risk from which the licensed teachers were required, as a matter of traditional common law, to protect Mr. Monroe. Stated in an alternative fashion, the loss of salary was not an "injury" that these teachers were required to guard against under traditional common law negligence.[4]
We recognize that, in Moransais, the supreme court states: "Under Florida's common law a person who is injured by another's negligence may maintain an action against the other person based on that other person's violation of a duty of due care to the injured person." 744 So.2d at 975.[5] Although this broad statement is an adequate description of black letter law, it does not reflect the difficulties that common law judges have experienced in defining "injury" and "duty of care." Because Moransais involved purely intangible economic injury, the case might now be read to permit a plaintiff to allege a negligence *534 theory any time any economic injury occurs due to the failure of a defendant to act reasonably. See Moransais, 744 So.2d at 977. As explained below, we reject that reading of Moransais and interpret Moransais as applying only to allow professionals to be sued personally on established theories of professional negligence, even though a contractual relationship exists between the plaintiff and the professional's corporation.

III. FIVE GENERAL APPROACHES TO NEGLIGENCE CASES

INVOLVING ONLY ECONOMIC DAMAGES
Moransais is but one case among many struggling to establish an appropriate role for negligence law in cases involving plaintiffs who suffer intangible damages, i.e., purely economic damages. Although all of these cases involve plaintiffs seeking to pursue an action for negligence when their damages are unconnected to bodily injury or damage to property, the cases arise in several different contexts.[6] It is important to understand that the legal theories used to resolve these cases stem from separate origins and have evolved separately. There is a tendency for legal thinkers to intentionally or unintentionally intermingle these approaches. This is dangerous because the policies underlying and justifying an approach in one context may not support a similar outcome in another context. The most troublesome cases have arisen where two or more conflicting approaches can be applied to a single set of facts. The cases invoking the "economic loss rule" in the field of construction law are perhaps the best example of cases in which conflicting approaches compete for different outcomes.
A careful review of the broad body of law addressing negligence claims for economic injuries suggests at least five separate, but somewhat interrelated, general theoretical approaches. These five approaches are by no means controlling rules of law, but they often disclose the reasons underlying our rules of law. We provide these propositions as subjects as much for debate as for disposition. We believe that cases can be better resolved if both lawyers and judges recognize these different approaches and consider the differences in their respective legal heritages when deciding whether a cause of action in negligence exists in a specific context. Briefly described, these approaches are:

1. The Traditional Negligence Approach.

Negligence law evolved from the intentional tort of trespass on the case.[7] Because trespass on the case tended to protect a plaintiff only for property damage or injury to person, that is the nature of the protection carried over to negligence law. Thus, the general standards of care traditionally created by negligence law are standards designed to protect person and property from physical injury. See Sandarac Ass'n, 609 So.2d at 1352-55. Beyond this heritage, there are a number of reasons why good common law judges placed these limitations on traditional negligence. *535 From an emotional standpoint, people did not sense a need to punish or seek vengeance for such losses from the people who unintentionally caused the nonphysical, economic loss. See Oliver Wendell Holmes, The Common Law 6 (Mark DeWolfe Howe ed., 1963). From a legal viewpoint, our court system needed to be reserved for basic claims and not inundated with the more remote claims. See Robert L. Rabin, Tort Recovery for Negligently Inflicted Economic Loss: A Reassessment, 37 Stan. L.Rev. 1513, 1527 (1985). In a free market economy, judges wished to encourage people to exercise their freedom of contract to bargain for private rights and remedies concerning economic issues. The law of negligence effectively creates a social contract of safety. From an economic perspective, traditional common law judges decided that these purely intangible economic risks were matters that should be left as externalities borne by the party that experienced them rather than as costs internalized into the social contract of safety. See Oliver Wendell Holmes, The Common Law 42 (Mark DeWolfe Howe ed., 1963) ("[S]ound policy lets losses lie where they fall, except where a special reason can be shown for interference."). This theory suggests that the judiciary should be adverse to expanding the "social contract" created by negligence law to protect economic losses unless the court can safely conclude that, had the public been free to bargain and pay for the standards of care arising from these duties in negligence, it is virtually certain that objective buyers of safety and sellers of care would have created contractual obligations comparable to the duties imposed by the court.[8] This social contract of negligence has similarities to statutory law, and thus the court usually creates a new general standard of care in negligence protecting economic interests only when the need to provide the protection is so clear that no legislative guidance is required.

2. The Professional Malpractice Quasi-Contract Approach.

Professional malpractice has its origins in contract law. Initially, the professional was viewed as breaching his or her professional duties under a contractual relationship of privity with the client. When contract theories failed to provide a good justification to permit an award for bodily injury damages, particularly in medical malpractice, the cause of action evolved into a negligence theory.[9] As a result, professional malpractice incorporated negligence theories, not only for medical malpractice resulting in physical injury, but also for other types of professional malpractice where the damages were primarily or purely intangible economic losses.[10] In light of this history, the social contract expressed by our law of negligence is more likely to protect economic injuries arising in professional negligence claims because those claims are viewed as quasi-contractual.[11] *536 In essence, we use negligence law to insert obligations of reasonable care protecting some economic interests into the professionals' contracts with their clients. Because purely economic risks are normally left to private bargaining in our legal tradition, common law judges need a strong justification to add such obligations of reasonable care to protect against losses unconnected to bodily injury or property damage.

3. The Products Liability Approach.

During the twentieth century, the law of products liability rapidly changed from warranty law to a separate field dominated by a strict liability theory. The implied warranty theory of products liability never satisfactorily explained how pain and suffering damages could be recoverable under warranty law, especially from a manufacturer with no privity to the victim.[12] As a result, products liability theory evolved into strict liability.[13] When this happened, the economic remedies of warranty law were generally left behind in the Uniform Commercial Code where they belonged.[14] The "economic loss doctrine" invoked by East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), was created to assure that warranty claims remained in warranty law and did not evolve into a type of strict liability. See also Florida Power & Light Co. v. Westinghouse Elec. Corp., 510 So.2d 899, 902 (Fla. 1987).[15] Thus, there is a strong tendency to prohibit products liability claims for purely intangible economic damages and to require those economic risks associated with products to be resolved through warranty law and private contracts.

4. The Separation of Contract and Negligence Approach.

This approach normally is utilized when the parties have a contractual agreement and the court focuses upon the existence of the contract to decide what, if any, negligence theory should exist. This approach is often utilized in opinions in which the judiciary fears that an expanded negligence theory would allow contract law to drown in a "sea of tort." East River Steamship Corp., 476 U.S. at 866, 106 S.Ct. 2295 (citing G. Gilmore, The Death of Contract, 87-94 (1974)).
At one level, this approach is only a clarification of the traditional negligence *537 approach. It emphasizes that the existence of a contractual relationship is a good reason not to create a negligence cause of action shifting economic risks that the parties could have shifted through bargaining. See Lewis v. Guthartz, 428 So.2d 222 (Fla.1982); AFM Corp. v. Southern Bell Tel. & Tel. Co., 515 So.2d 180 (Fla. 1987).[16] Even the existence of a realistic opportunity for a pre-loss agreement between the plaintiff and the defendant may sometimes be viewed as a basis for refusing to expand negligence law to protect the type of economic risks typically resolved within a contract. See Florida Power, 510 So.2d 899; Strickland-Collins Constr. v. Barnett Bank of Naples, 545 So.2d 476 (Fla. 2nd DCA 1989).
This approach perhaps goes beyond the traditional negligence approach when it suggests that the judiciary should rarely use the obligations contained in the private contract to create standards of care in negligence law, especially to remedy purely economic losses. Courts sometimes explain that the plaintiff must have a "separate independent tort" to bring an action. See HTP, Ltd. v. Lineas Aereas Costarricenses S.A., 685 So.2d 1238 (Fla.1996); Pershing Indus., Inc. v. Estate of Sanz, 740 So.2d 1246 (Fla. 3d DCA 1999). This assures that the general standard of care in the negligence action is based on broader social policies and not merely the parties' private contractual obligations. If courts violated this principle with impunity and provided remedies in negligence for intangible economic injuries, contract law and negligence law would tend to merge and there would be no reason for private parties to bargain for private remedies when they were already assured of a public remedy.

5. The Negligent Misrepresentation Theory.

In limited circumstances, a party may recover purely economic losses arising from a misrepresentation that is made in a negligent manner. See First Florida Bank, N.A. v. Max Mitchell & Co., 558 So.2d 9 (Fla.1990); Gilchrist Timber Co. v. ITT Rayonier, Inc., 696 So.2d 334 (Fla. 1997); Restatement (Second) of Torts § 552 (1977). Although the tort of negligence historically evolved from the intentional tort of trespass on the case, this modern commercial tort is evolving from the intentional tort of fraud.[17] Thus, this negligence theory has a heritage that never required bodily injury or property damage. It has been limited by some courts when competing principles indicate that recovery should not be allowed for purely intangible economic loss. See Russell v. Sherwin-Williams Co., 24 Fla. L. Weekly D713, ___ So.2d ___, 1999 WL 140530 (Fla. 4th DCA Mar.17, 1999); Palau Int'l Traders, Inc. v. Narcam Aircraft, Inc., 653 So.2d 412 (Fla. 3d DCA 1995). It is perhaps fair to suggest that the full scope of this theory has not yet developed in the case law, but the development of this negligence theory may take a different path than other negligence theories because the underlying policies that it brings forward from the law of fraud are so different from the policies underlying traditional negligence theories.
We, as judges and lawyers, tend to have difficulties resolving cases when two or more of these approaches provide conflicting guidance. In the last decade, for example, the troublesome cases discussing the dreaded economic loss rule have usually arisen in the field of construction. See Ocean Ritz of Daytona Condominium v. GGV Assocs., Ltd., 710 So.2d 702 (Fla. 5th DCA 1998); Sandarac Ass'n v. W.R. Frizzell Architects, Inc., 609 So.2d 1349 (Fla. *538 2d DCA 1992); Casa Clara Condominium Ass'n v. Charley Toppino & Sons, Inc., 620 So.2d 1244 (Fla.1993). This is a field in which the professional negligence approach tends to advocate for greater quasi-contractual remedies for purely economic injuries caused by professional malpractice. This approach, however, conflicts with the concern that, if a building is a type of product, it should be subject to the economic loss doctrine applied in the law of products liability. It is also a field in which contracts do or can exist, but the hierarchy of contractors, subcontractors, and suppliers, as well as the separate arrangements with architects and engineers, often leave the intended owner of a building with inadequate or non-existent contractual rights. Because of these competing concerns, the courts may occasionally conclude that there is sufficient justification to add protection for certain purely economic injuries to the law of professional negligence, even though this expands the social contract at the expense of private contracts. If the legislature disagrees with the public policies announced by the courts in these cases, it will usually be free to restructure this body of construction law.
Moransais is probably an example of such a case. We do not believe, however, that Moransais should be read to allow recovery for purely intangible economic losses through negligence in a wider array of cases that do not present the same conflicting issues found in construction law. Rather courts still need to make careful assessments before expanding negligence law to cover purely economic injuries.
In this case, the products liability approach is not helpful because the teachers/administrators at best supplied a gratuitous service, not a product. Mr. Monroe did not even attempt to allege a negligent misrepresentation theory.[18] The other three approaches described above all support our holding that Mr. Monroe cannot recover his losses in negligence.
The traditional negligence theory clearly supports denying recovery in negligence to Mr. Monroe. By analogy, if a plaintiff loses a job or other business opportunity because he was delayed, but unharmed, in an automobile accident, he has no cause of action against the negligent driver for economic losses. The common law has long explained that the lost income was a remote injury or was not a legal injury, or said that the driver owed no duty or had no standard of care to protect against the risk of these losses. See Bayshore Dev. Co. v. Bonfoey, 75 Fla. 455, 78 So. 507 (1918); Western Union Tel. Co. v. Barlow, 51 Fla. 351, 40 So. 491 (1906). Likewise, the purely intangible economic injury suffered by Mr. Monroe in this case without accompanying physical harm to person or property may be a risk within some zone of economic risk that is foreseeable to his prospective employer as a matter of fact, but this economic danger is simply not the type of risk that the law places within the "zone of risk" utilized to define the general standards of care in a negligence case. See McCain v. Florida Power Corp., 593 So.2d 500 (Fla.1992).
With respect to any approach that emphasizes the separation of contract and negligence law, although this approach would normally assist the School Board, it has little relevance because there was no contract between Mr. Monroe and the School Board or the administrators concerning the processing of his job application. It is doubtful that Mr. Monroe could have obtained a special contract with the School Board concerning his job search. To give Mr. Monroe this action in negligence would transform traditional negligence into an unrestricted form of promissory estoppel. See W.R. Grace & Co. v. *539 Geodata Servs., Inc., 547 So.2d 919 (Fla. 1989).
Although these teachers/administrators are professionals, as that term is defined in Moransais, the professional negligence approach does not merit an expansion of traditional negligence law to allow recovery for Mr. Monroe's economic injuries. The expanded liability in negligence for professionals evolved from the contract between the professional and the client. The mere existence of a professional does not create a cause of action in negligence to protect some unlimited class of plaintiffs. The relationship that supports a quasi-contractual professional negligence theory is a relationship of privity or perhaps that of a third-party beneficiary. Mr. Monroe simply did not have that relationship with the professionals who lost track of his job application.[19]
Accordingly, we see no justification to provide a remedy through the law of negligence in this case.
Affirmed.
THREADGILL, A.C.J., and DAVIS, J., Concur.
NOTES
[1] See Moransais v. Heathman, 744 So.2d 973, 979 (Fla.1999).
[2] The supreme court had previously extended negligence law to protect some third parties' intangible economic expectations from the negligence of certain professionals. See First Fla. Bank, N.A. v. Max Mitchell & Co., 558 So.2d 9 (Fla.1990); First Am. Title Ins. Co. v. First Title Serv. Co. of the Fla. Keys, 457 So.2d 467 (Fla.1984); cf. Angel, Cohen & Rogovin v. Oberon Inv., N.V., 512 So.2d 192 (Fla.1987) (declining to extend attorney's liability to incidental beneficiary of services). However, in these cases the plaintiff was a third party who arguably was an intended beneficiary of a contract between the defendant and another person.
[3] Whether this claim would be barred by sovereign immunity is not an issue resolved in the trial court or reached on appeal. We note, however, that a claim directly against the administrators who allegedly were negligent would appear to be barred by sovereign immunity. See § 768.28(9)(a), Fla. Stat. (1995). Thus, Mr. Monroe sued the School Board as the employer of these professionals under section 768.28(1), Florida Statutes (1995).
[4] We note that even when a teacher has a formal student/teacher relationship with the plaintiff, courts have traditionally refused to create a cause of action for "educational malpractice" based primarily upon public policy considerations. See Armstrong v. Data Processing Inst., Inc., 509 So.2d 1298 (Fla. 1st DCA 1987); Tubell v. Dade County Pub. Schools, 419 So.2d 388 (Fla. 3d DCA 1982); Hoffman v. Board of Educ. of the City of New York, 49 N.Y.2d 121, 400 N.E.2d 317, 424 N.Y.S.2d 376 (1979).
[5] As support for this proposition, footnote 3 of Moransais cites to 38 Fla. Jur.2d, Negligence, § 156 (1998).
[6] In each of these contexts, we suspect that the relationship between the plaintiff and the defendant is the critical factor in determining whether a negligence cause of action exists. In negligence law, the concept of "duty" has two components: (1) the relationship that justifies placing a requirement of care upon the defendant, and (2) the general standard of care that defines the risks to be foreseen by the defendant and the level of care to be imposed upon the defendant. See Spadafora v. Carlo, 569 So.2d 1329 (Fla. 2d DCA 1990); Dennis v. City of Tampa, 581 So.2d 1345 (Fla. 2d DCA 1991); Bryant v. Lucky Stores, Inc., 577 So.2d 1347, 1351 n. 2 (Fla. 2d DCA 1990) (Altenbernd, J., concurring in part and dissenting in part). Difficult economic loss cases all seem to examine the relationship between the parties to determine whether it warrants creating a duty to protect economic interests outside contract and statutory law.
[7] See W. Page Keeton et al., Prosser and Keeton on Torts § 6, at 28 (5th ed.1984).
[8] Because negligence traditionally has been limited to claims involving bodily injury and property damage, insurance companies typically market policies providing coverage primarily for claims involving bodily injury and property damage. At least to a limited degree, this fact discourages new negligence theories allowing recovery for purely economic losses because courts hesitate to create negligence claims for which no insurance coverage will be available. See, e.g., Ard v. Ard, 414 So.2d 1066 (Fla.1982).
[9] See Hawkins v. McGee, 84 N.H. 114, 146 A. 641 (1929) (permitting "benefit of the bargain" damages for "hairy hand"). There is an irony in the fact that professional malpractice evolved into a tort, not to solve an economic loss problem, but to solve the problem of bodily injury damages under contract law. The pressures initiating this evolution of negligence law are almost exactly opposite from the pressures currently created by the various economic loss doctrines.
[10] See Riccio v. Stein, 559 So.2d 1207 (Fla. 3d DCA 1990) (legal malpractice); Coopers & Lybrand v. Trustees of the Archdiocese of Miami/Diocese of St. Petersburg Health & Welfare Plan, 536 So.2d 278 (Fla. 3d DCA 1988) (accountant malpractice).
[11] Compare Menefee v. Alexander, 107 Ky. 279, 53 S.W. 653 (1899) (holding an action for malpractice of a physician is contractual in nature) with Mullin v. Flanders, 73 Vt. 95, 50 A. 813 (1901) (finding malpractice of surgeon requires recovery in tort), and Conklin v. Draper, 229 A.D. 227, 241 N.Y.S. 529 (1930) (allowing plaintiff to recover contract damages for physician's malpractice when statute of limitations barred recovery in negligence). We note that section 95.11(4)(a), Florida Statutes (1997), regarding limitation of actions continues to state, "An action for professional malpractice, other than medical malpractice, whether founded on contract or tort...." See also Hewko v. Genovese, 739 So.2d 1189 (Fla. 4th DCA 1999) (finding privity is generally required in legal malpractice action).
[12] See, e.g., Blanton v. Cudahy Packing Co., 154 Fla. 872, 19 So.2d 313 (1944); Matthews v. Lawnlite Co., 88 So.2d 299 (Fla.1956). See also Robin Gibson, "Theories of Liability," Products Liability in Florida § 2.3 (Fla. Bar. CLE 3d ed.1995).
[13] See West v. Caterpillar Tractor Co., 336 So.2d 80 (Fla.1976).
[14] See generally Kramer v. Piper Aircraft Corp., 520 So.2d 37 (Fla.1988) (restricting implied warranty to cases involving privity); GAF Corp. v. Zack Co., 445 So.2d 350 (Fla. 3d DCA 1984) (same).
[15] In their dissents in Moransais, Justices Wells, Pariente, and Overton accurately reflect the separate origin of the East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), economic loss rule. See also Comptech Int'l, Inc. v. Milam Commerce Park Ltd., 24 Fla. L. Weekly S507, ___ So.2d ___, 1999 WL 983857 (Fla. Oct. 28, 1999). To restrict limitations on the recovery of intangible losses only to products liability cases, however, would overlook some of the policy considerations underlying the other theories discussed in this opinion.
[16] See also U.S. Const. art. I, § 10 ("No State shall ... pass ... any Law impairing the Obligation of Contracts.").
[17] See W. Page Keeton et al., Prosser and Keeton on Torts § 6, at 28 (5th ed.1984); see generally Atlantic Nat'l Bank v. Vest, 480 So.2d 1328, 1331 (Fla. 2d DCA 1985) (intermingling the elements of fraud and negligent misrepresentation).
[18] Mr. Monroe did allege that he called the School Board about the "Donald Roe" letter and was assured over the telephone by someone that he was on the appropriate list. We doubt Mr. Monroe's status as a prospective employee is the type of relationship that creates a duty concerning negligently supplied information. In any event, there is nothing in the record to suggest that the unidentified person made a negligent misrepresentation.
[19] The outcome might be different if Mr. Monroe had hired a professional job placement service to obtain a teaching position for him in a suitable school system.